**Pervis T. PAYNE, Petitioner,**

v.

**Ricky BELL, Warden, Respondent.**

**No. 98–2963–D/BRE.**

United States District Court,
W.D. Tennessee,
Western Division.

March 25, 2002.

J. Brook Lathram, Esq., W. Les Jones, Jr., Esq., Les Jones, Burch Porter & Johnson, Memphis, TN, Todd Alan Rose, Burch Porter & Johnson, Paris, TN, Christopher M. Minton, Esq., Post Conviction Defender, Nashville, TN, for Petitioner.

Erik Daab, Office of the Attorney General, Nashville, TN, Glenn R. Pruden,

Esq., Office of the Attorney General, Criminal Justice Division, Nashville, TN, John W. Campbell, Esq., District Attorney General's Office, Memphis, TN, for Respondent.

Pervis T. Payne, Unit II, Nashville, TN, Pro se.

ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDG- MENT ORDER OF DISMISSAL AND ORDER TO FILE BRIEFS CONCERNING A CERTIFICATE OF APPEALABILITY

DONALD, District Judge.

This Court's May 31, 2001 order dismissed every claim in the petition except for Claims 4, 6, 13 (Petition at ¶ 176), 16, and 17. The Court directed the parties to submit additional briefs with respect to the remaining claims and further directed respondent to submit a copy of a videotape introduced by the State during Payne's sentencing hearing. Briefing has now concluded, and the Court will proceed to address the merits of the remaining claims.

A. *The Tennessee state courts should have granted a hearing on the petition for writ of error coram nobis (Claim 4)*

■ Petitioner's fourth claim for relief alleges that his Fourteenth Amendment rights were violated by the failure of the Tennessee courts to conduct an evidentiary hearing on the petition for writ of error *coram nobis*, which asserted the existence of certain newly discovered evidence tending to show Payne's actual innocence of the crimes. Petition at ¶¶ 63–76. Payne asks this Court to reinstate his *coram nobis* petition and to direct the Tennessee state courts to afford him a full and fair evidentiary hearing on that petition. *Id.* at ¶ 76.

The parties had filed cross-motions on this claim, and the Court, in its May 31, 2001 order, denied those motions. The Court set forth a number of concerns it had about the substance of this claim. As a preliminary matter, the Court was concerned that the remedy sought by Payne-an evidentiary hearing in state court-is not an appropriate subject for a petition pursuant to 28 U.S.C. § 2254.[1]

The leading Sixth Circuit case in this area is *Kirby v. Dutton,* 794 F.2d 245 (6th Cir.1986), in which a habeas petitioner complained that he was denied the effective assistance of counsel in his state post-conviction proceeding. Kirby raised both equal protection and due process claims:

On appeal, Kirby indicates that he claims in his petition that he was denied due process and equal protection when the court refused to replace his counsel and forced him to continue with unwanted counsel. Kirby argues that once the trial court determined that Kirby was entitled to representation in the collateral attack proceeding because he was an indigent, then Kirby was entitled to effective and meaningful representation in order to satisfy the requirements of fundamental fairness guaranteed by the due process clause of the fifth and fourteenth amendments of the United States Constitution. Kirby further argues that he is entitled to effective and meaningful representation pursuant to the equal

---

1. Petitioner attempts to avoid this issue by suggesting that this Court "grant a conditional writ of habeas corpus mandating Payne's release unless the State of Tennessee cures its violation of Payne's due process rights." P. Supp. Br. at 64; *see also id.* at 67. However, although this claim, if successful, may ultimately lead to Payne's release, petitioner's request for a conditional writ of habeas corpus seems to exceed the scope of the relief available under the state *coram nobis* statute, Tenn.Code Ann. § 40–26–105, and is also inconsistent with controlling Sixth Circuit precedent, *see supra* pp. ——— ———.

protection clause of the fourteenth amendment and was denied this because a solvent petitioner could have replaced his counsel immediately with counsel willing to zealously and competently represent his interests.

*Id.* at 246.[2]

The Sixth Circuit held that "Kirby's claims cannot be brought under the federal habeas corpus provision." 794 F.2d at 246. In so holding, the Sixth Circuit relied on language in the Supreme Court's decision in *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), to the effect that

[i]t is clear, not only from the language of ... § 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody.

*Kirby*, 794 F.2d at 246 (quoting *Preiser*, 411 U.S. at 484, 93 S.Ct. 1827) (ellipses in original). According to the Sixth Circuit, Kirby's claim fell outside the mainstream of federal habeas claims because it did not raise an issue directly pertaining to the fact or duration of his confinement:

Kirby claims a denial of the sixth amendment right to effective assistance of counsel, a denial of due process, and a denial of equal protection in the State *post-conviction* proceedings-claims unrelated to his detention.... If we were to allow Kirby to proceed on his petition and if we were to hold in favor of Kirby, the results would not be release or a reduction in Kirby's time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention.

*Id.* at 247 (emphasis in original). After surveying decisions from other circuits, *id.*, the Sixth Circuit concluded that the relief sought by Kirby was not available in a habeas proceeding:

We believe that the result of the habeas petition need not necessarily be reversal of the conviction. However, the petition must directly dispute the fact or duration of the confinement.... Though the *ultimate* goal in this case ... is release from confinement, the result of habeas review of the specific issues before us is not in any way related to the confinement. We decline to allow the scope of the writ to reach this second tier of complaints about deficiencies in state post-conviction proceedings. We find the *Williams* stance persuasive in light of the history of the scope of the writ as discussed in *Preiser* and our own hesitancy to enlarge the scope of the writ of habeas corpus without specific Supreme Court guidance.

*Id.* at 248 (emphasis in original) (citing *Williams v. Missouri*, 640 F.2d 140, 144 (8th Cir.1981)).[3]

**2.** The particular claim at issue in *Kirby,* the right to effective representation of counsel at state postconviction proceedings, was later rejected by the Supreme Court in *Coleman v. Thompson,* 501 U.S. 722, 752–57, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

**3.** The Sixth Circuit has regularly applied *Kirby* to summarily reject similar challenges to procedures used in state collateral proceedings. *See Greer v. Mitchell,* 264 F.3d 663, 681 (6th Cir.2001) (rejecting claim that "Ohio's post-conviction scheme fails to provide defen-

dants an adequate corrective process for reviewing claims of constitutional violations"), *petition for cert. filed* (U.S. Dec. 3, 2001) (No. 01–7773); *Sherley v. Parker,* 2000 WL 1141425, at *6, 229 F.3d 1153,(6th Cir.2000) (state court's denial of an evidentiary hearing on motion to vacate sentence); *Johnson v. Collins,* 1998 WL 228029, at *1, 145 F.3d 1331 (6th Cir.1998); *Buerger v. Mohr,* 1993 WL 72485, 989 F.2d 498 (6th Cir.1993); *Rembert v. Morris,* 1991 WL 21977, 925 F.2d 1465 (6th Cir.1991); *Bartley v. Sowders,* 1990 WL 29800, 898 F.2d 153 (6th Cir.1990); *Helm-*

The Sixth Circuit's decision in *Kirby v. Dutton* is binding on this Court. Accordingly, the Court holds that Payne's claim that the Tennessee courts violated Tennessee law in failing to hold a hearing on his petition for a writ of error *coram nobis* does not state a cognizable habeas claim.[4]

Petitioner also attempts to argue that "Tennessee's complete denial of an evidentiary hearing on a matter bearing directly on Payne's actual innocence is such a fundamental miscarriage of justice that it is also a deprivation of a right that is derived directly from federal due process." P. Supp. Br. at 67 n. 61 (citing *Herrera v. Collins*, 506 U.S. 390, 411, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)). However, this claim was not exhausted in state court and has, therefore, been procedurally defaulted.[5]

bright *v. Baker*, 1990 WL 27400, at *1, 898 F.2d 154 (6th Cir.1990) (rejecting claim that "the fact-finding process employed by the trial court in denying his motion for post-conviction relief did not afford him a full and fair hearing"); *Smith v. Fletcher*, 1990 WL 25804, at *3–*4, 898 F.2d 154 (6th Cir.1990) (per curiam); *Mapson v. Russell*, 1989 WL 16211, 869 F.2d 1491 (6th Cir.1989); *Berry v. Lack*, 1987 WL 38650, at *1, 831 F.2d 293 (6th Cir.1987) (rejecting claim that petitioner "was denied a fair hearing in state court on his petition for post-conviction relief"); *Hudson v. Jago*, 1987 WL 37908, 822 F.2d 59 (6th Cir.1987) (per curiam); *Terrell v. Dutton*, 1987 WL 37374, 822 F.2d 1089 (6th Cir. 1987).

4. Petitioner urges this Court to hold that *Kirby* is inconsistent with two Supreme Court decisions arising in the equal protection context, *Smith v. Bennett*, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961), and *Lane v. Brown*, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963). P. Supp. Br. at 66. However, as previously noted, *see supra* p. 742 n. 2, the Supreme Court's later decision in *Coleman v. Thompson* is consistent with *Kirby*.

5. The characterization of the state-court's decision as a "fundamental miscarriage of justice" does not appear warranted. As was

For all the foregoing reasons, the Court GRANTS respondent's motion for summary judgment with respect to Claim 4.

**B.** *Petitioner Received Ineffective Assistance of Counsel at the Sentencing Stage of His Trial (Claim 6)*

In his sixth claim for relief, Payne alleges that his rights under the Sixth and Fourteenth Amendments were violated by the failure of his trial counsel to investigate and present sufficient mitigation evidence at his capital sentencing hearing. In particular, Payne complains about the failure of his trial counsel to interview and present the testimony of numerous character witnesses concerning his character and reputation in the community.

After reviewing Payne's additional submission, the Court is unable to conclude

noted in this Court's May 31, 2001 order (pp. 76–77), this Court has already rejected Payne's actual innocence claim based on the Williams affidavits. *See* 5/31/01 Order at 83–84. That discussion will not be recounted here at length. Suffice it to say that petitioner's extended discussion of the potential significance of the Williams affidavits, P. Supp. Br. at 69–75, does not persuade the Court that, had the substance of Williams's affidavits been presented to at trial, "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Likewise, the state trial-court judge, who was the trier of fact on the petition for writ of error *coram nobis*, expressed his view that the newly discovered evidence "would not have resulted in a different judgment if this evidence had been presented at trial." Addendum 5, Vol. 1, at 12.

Of course, nothing in this Court's order is meant to preclude, or even to discourage, the state courts from holding a hearing on Payne's petition for writ of error *coram nobis* in the event that is deemed appropriate. *See Workman v. State*, 41 S.W.3d 100 (Tenn. 2001). This order holds nothing more than that the refusal of the state trial court to afford a hearing on Payne's petition does not afford a basis for federal habeas relief.

that the decision of the Tennessee Court of Criminal Appeals with respect to this claim was contrary to, or an unreasonable application of, clearly established federal law. In particular, Payne has not satisfied his burden of demonstrating prejudice. The character evidence adduced at the postconviction hearing suggests that Payne was a normal high school student who was interested in music and helpful at his father's church.[6] In light of the horrific nature of the crimes of which Payne was convicted and the fact that one of his victims was a very young child, the Court is not persuaded that a reasonable probability exists that, had the jury only heard more evidence from more witnesses concerning Payne's reputation in the community, the outcome of his sentencing hearing would have been different. *See Scott v. Mitchell,* 209 F.3d 854, 880–81 (6th Cir.) ("it is impossible to say for certain that one juror would not have been swayed by this evidence, but certainty is not required here; we must ask only whether Scott has met his burden of demonstrating a reasonable probability that this would happen"), *cert. denied,* 531 U.S. 1021, 121 S.Ct. 588, 148 L.Ed.2d 503 (2000). Indeed, this Court is unable to speculate about the effect the omitted evidence may have had on the jury. Although evidence that a capital defendant came from a seriously deprived background may create sympathy and put

his acts of violence in context, evidence of Payne's stable background may well have had the opposite effect than that intended by defense counsel.[7]

▪ Although Payne's failure to demonstrate prejudice provides a sufficient basis for dismissing this claim, the Court is unable to conclude that trial counsel's performance was deficient. In each of the Sixth Circuit cases holding that an inmate received ineffective assistance during the penalty stage of a capital trial, trial counsel did virtually no investigation, presented no evidence, and made no arguments on the defendant's behalf. *Cone v. Bell,* 243 F.3d 961, 975–79 (6th Cir.), *cert. granted,* —— U.S. ——, 122 S.Ct. 663, 151 L.Ed.2d 578 (2001); *Carter v. Bell,* 218 F.3d 581, 600 (6th Cir.2000) ("It is not just that the defense presented on Carter's behalf was ineffective; rather, Carter's attorneys did not even attempt to present a defense at the sentencing phase."); *Austin v. Bell,* 126 F.3d 843, 849 (6th Cir.1997) ("Livingston's failure to investigate or present any mitigating evidence undermined the adversarial process and rendered the death sentence unreliable").

Here, by contrast, trial counsel did present meaningful evidence and argument during the penalty phase of trial. He presented the testimony of Payne's mother, father, and girlfriend concerning Payne's

---

**6.** The substance of the testimony is summarized at pages 107–08 of this Court's previous order and is set forth in detail in the petition.

**7.** In the May 31, 2001 order, this Court expressed the view that resolution of this claim should await "determination of the full scope of any aggravating circumstances to be weighed against the mitigating evidence Petitioner contends should have been offered at trial." 5/31/01 Order at 119. On further reflection, that analysis does not appear appropriate. The law seems clear that the deficient performance prong of the ineffective assistance analysis is evaluated from "coun-

sel's perspective at the time," without "the distorting effects of hindsight." *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see Adams v. Jago,* 703 F.2d 978, 981 (6th Cir.1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, *at the time,* the decisions would have seem reasonable to the competent trial attorney'") (emphasis added). If so, then it seems equally inappropriate to conflate the prejudice prong of *Strickland* with the harmless error analysis that is required when an aggravating factor relied on by the jury is invalidated.

character and reputation in the community. He also presented the testimony of Dr. John Robert Hutson, a clinical psychologist, concerning Payne's limited mental abilities. Trial counsel also eloquently pleaded with the jury to spare his client's life.

Although the state of the record does not permit a determination of what steps trial counsel took to investigate potential mitigating evidence, it seems undisputed that trial counsel did not speak to the witnesses who testified in the state post-conviction proceeding. Because petitioner did not seek an explanation from trial counsel, petitioner seems to take the position that the failure to interview these witnesses constitutes ineffective assistance of counsel as a matter of law. That position is not supported by the case law. Although petitioner cites the Sixth Circuit's recent opinion in *Cone*, 243 F.3d at 978, for the proposition that the explanation a trial lawyer offers for his decisions will not necessarily be accepted at face value, *see* P. Supp. Br. at 9, the Sixth Circuit in *Cone* also stated that "[t]he failure to present [any] mitigating evidence in a death penalty case does not necessarily constitute ineffective assistance of counsel, 243 F.3d at 977."

Petitioner also attempts to sidestep his failure to question Mr. Garts at the post-conviction hearing concerning his strategy by arguing that, because he identified potential witnesses who were not interviewed by defense counsel, the burden shifted to the State to present a reasonable explanation for that failure. P. Supp. Br. at 9. Petitioner cites no authority for that proposition. No matter how diligent the efforts of trial counsel to prepare for the penalty phase of trial, it will almost always be possible to locate someone with a unique story to tell about the defendant who was not previously identified. The mere existence of these undiscovered witnesses does not satisfy Payne's burden of demonstrating that the performance of trial counsel was objectively unreasonable.[8]

Moreover, the Court is not prepared to assume that, because trial counsel did not interview the witnesses identified in the petition, he was unaware of the evidence they could present.[9] It is reasonable to assume that trial counsel spoke to Payne and his parents concerning potential mitigating evidence.[10] Without the testimony of Mr. Garts, the scope of counsel's investigation of potential mitigating evidence cannot be assessed. There simply is no basis in the record to conclude that "[t]he sole

---

**8.** The Court cannot avoid the strong suspicion that petitioner made a tactical decision not to elicit the testimony of Mr. Garts, either at the postconviction hearing or by affidavit or deposition at any later time. Mr. Garts is still practicing law in this community and presumably is, and has been, available. Moreover, as noted in this Court's previous order, Mr. Garts did testify at the postconviction hearing in connection with the *Brady* issue. *See* 5/31/01 Order at 111. Although petitioner would doubtless reply that the State has also apparently chosen not to introduce the testimony of Mr. Garts, the fact remains that petitioner has the burden of proof in his efforts to overturn his conviction. Indeed, this is the only § 2254 petition that this Court can recall in which a petitioner who is represented by counsel attempted to bring an ineffec-

tive assistance claim without, at some point in the proceedings, having obtained the testimony of defense counsel.

**9.** Petitioner does not explain how certain of those witnesses, who Mr. Garts presumably did not speak to, knew they should appear at the guilt phase of trial to testify concerning Payne's reputation for truthfulness.

**10.** Indeed, the efforts of Payne's father apparently led to the John Edward Williams affidavit that figured so prominently in the petition. Addendum 5, Vol. 1, at 5; *id.*, Vol. 2, at 10 (statement of Mr. Feild) ("Mr. Williams was only discovered after [the trial], when Mr. Payne's father was conducting [an] investigation to assist us in looking for new evidence").

source of the mitigating evidence [was] that information which defendant may volunteer." *Carter v. Bell,* 218 F.3d at 597.

Finally, as was noted in this Court's previous order, 5/31/01 Order at 101–03, 108–09, there is evidence that defense counsel had compelling reasons to avoid the introduction of character evidence that would open the door to evidence of Payne's prior bad acts, including his reputation as a "peeping Tom." [11] Although petitioner apparently concedes that defense counsel deliberately limited the evidence that was introduced during the guilt phase of the trial, he suggests that Mr. Garts could not have been pursuing such a strategy during the mitigation phase. P. Supp. Br. at 10–11. Petitioner first suggests that the broad scope of the testimony offered by Payne's parents and girlfriend belies the conclusion that defense counsel wanted to avoid opening the door to unfavorable testimony. Although that point has some theoretical appeal, the prosecution did not attempt to introduce the "peeping Tom" evidence during the sentencing phase of trial and there is no evidence in the record regarding the reason for that decision.

Petitioner also suggests that the testimony would not have been admissible under Tennessee law because it did not specifically rebut the available mitigation testimony.[12] As support for that position, Payne cites *Carter v. Bell,* 218 F.3d at 597, in which the Sixth Circuit rejected defense counsel's explanation that he failed to introduce available mitigation evidence for fear that it "would open the door to rebuttal evidence of Carter's extensive criminal background and violent history." According to the Sixth Circuit, that evidence is not relevant under Tennessee law. *Id.* at 597–98. The problem with this argument is that it ignores the trial judge's explicit warning that such testimony would be admissible if the defense sought to introduce evidence of Payne's reputation "for peacefulness and quietude and that type of thing." Addendum 1, Vol. 16, at 1323. Petitioner's argument also ignores the statement of the Tennessee Court of Criminal Appeals to the effect that "we cannot minimize trial counsel's obvious concerns that testimony about the appellant's character would have opened the door to questions about the appellant's alleged bad acts." Addendum 6, Vol. 5, at 28. Thus, in contrast to *Carter,* in this case there is every indication from the record that the "peeping Tom" mitigation evidence would have been admitted during the guilt phase of trial.[13] This Court is not prepared to

---

11. Although petitioner appears to suggest that Mr. Garts did not conduct a sufficiently thorough examination to know of the "peeping Tom" evidence, P. Supp. Br. at 10, the record is not sufficiently clear to permit this Court to reach such a conclusion. As was noted in this Court's previous order, 5/31/01 Order at 101–03, Mr. Garts filed a pretrial motion *in limine* seeking to exclude evidence of Payne's prior drug use. During the trial, when the defense introduced the testimony of the five character witnesses with respect to Payne's reputation for truthfulness, the prosecution sought to question them "about the defendant's reputation as a peeping Tom, a voyeur, and attempting to break in on women in the area in which he's lived, including peeping at women through windows in his own neighborhood." Addendum 1, Vol. 16, at 1322. In

any event, the trial judge declined to permit that line of questioning because defense counsel had limited the scope of these witnesses' testimony, *id.* at 1322–24, but he suggested that the evidence may be admissible if the defense sought to introduce evidence of Payne's reputation "for peacefulness and quietude and that type of thing." *Id.* at 1323.

12. This argument seems inconsistent with petitioner's first argument, that the questioning of Payne's parents and girlfriend opened the door.

13. In *Carter,* a pre-AEDPA case, the record evidence concerning the ineffective assistance claim was developed during an evidentiary hearing in federal court. There was apparently no ruling by any state court, formal or

hold that the evidentiary rulings of the Tennessee courts were inconsistent with Tennessee law.

For all the foregoing reasons, the Court GRANTS summary judgment to respondent on Claim 6.

C. *There was Insufficient Evidence to Support Application of the Aggravating Circumstance that, During the Murder of Either Victim, Petitioner Created a Risk of Death to Two or More Persons Other than the Murder Victim (Claim 17)*

In his seventeenth claim for relief, Payne alleged that his Sixth, Eighth, and Fourteenth Amendment rights were violated by the jury's consideration, as an aggravating circumstance, of the fact that Payne's conduct created a great risk of death to two or more persons. Petition at ¶¶ 201–11.[14] This Court's original order denied respondent's motion for summary judgment on the ground of procedural default. 5/31/01 Order at 197–200. This Court directed the parties to file briefs addressing the merits of this claim.

Before proceeding to address the merits of this claim, it is useful briefly to recount the procedural history of the claim and the scope of this Court's review. Petitioner did not raise this issue in the state courts. *Id.* at 198. However, this Court held that the state courts considered this issue pursuant to the mandatory-review provisions of Tenn.Code Ann. § 39–2–205(c)(1)(B) (formerly Tenn.Code Ann. § 39–2–205(c)(1)(B)), which requires the state appellate courts to consider whether "[t]he evidence supports the jury's finding of statutory aggravating circumstance or circumstances." *Id.* at 198–99.

■ Payne's challenge to the "great risk of death" aggravator

reduces, in essence, to a claim that the state court simply misapplied its own aggravating circumstance to the facts of his case. Because federal habeas corpus relief does not lie for errors of state law . . ., federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.

*Lewis v. Jeffers,* 497 U.S. 764, 779, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (citations omitted).[15] Such a claim is governed by the standards of *Jackson v. Virginia,*

---

otherwise, concerning admissibility of the prior bad acts evidence.

**14.** At the time of Payne's trial, this aggravating circumstance was defined as follows: "The defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder." Tenn.Code Ann. § 39–2–203(i)(3). Currently, Tenn.Code Ann. § 39–13–204(i)(3) is identical except it substitutes the word "the" for "his." The jury found this aggravating circumstance with respect to the deaths of both Charisse and Lacie Jo Christopher.

**15.** Payne does not raise a broad constitutional challenge to the "great risk of death" aggravator and, even if he had, such a claim would be procedurally defaulted. It does not appear that the Tennessee appellate courts, as part of their mandatory review of death sentences,

necessarily consider broad constitutional objections to statutory aggravating circumstances that have not been raised by the defendant. This Court is unwilling to hold that Tennessee's mandatory review provision necessarily encompasses all significant errors of a constitutional dimension. Such an interpretation would be not only contrary to the statutory language, "it would eliminate the entire doctrine of procedural bar in Tennessee capital cases." *Coe v. Bell,* 161 F.3d 320, 336 (6th Cir.1998).

In any event, Payne has not cited any authority for the proposition that the great risk of death aggravating circumstance is unconstitutional. The law is clear that a federal habeas court generally may not announce and grant retroactive application to new rules of constitutional criminal procedure. *See, e.g., Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257,

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See id.* at 781–83, 110 S.Ct. 3092; *see also* 5/31/01 Order at 202–03. Thus, "[a] state court's finding of an aggravating circumstance in a particular case-including a *de novo* finding by an appellate court . . .—is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Lewis,* 497 U.S. at 773, 110 S.Ct. 3092.

■ Payne's challenge to the great risk of death aggravator rests on the premise that, in order to find the aggravator, the jury had to reach a conclusion about the order in which the victims were attacked. In applying the statute, petitioner focuses on the words "other than the victim murdered" to construct an argument that, because both Charisse and Lacie Jo Christopher were murdered during the knife attack, Payne's actions could only have

caused a "great risk of death" to one person, Nicholas Christopher, the sole survivor of the attack.[16]

Petitioner cites no Tennessee decisions that stand for the proposition that application of the "great risk of death" aggravator with respect to both Charisse and Lacie Jo Christopher is inconsistent with Tennessee law. In *State v. Cone,* 665 S.W.2d 87, 95 (Tenn.1984), the Tennessee Supreme Court stated that "generally the statute does not contemplate an extended criminal episode, but contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based."[17] Nonetheless, the court went on to state that "[i]t is unnecessary here to attempt to define all possible fact situations which might be covered by this statute." *Id.* at 95, n. 2.[18]

108 L.Ed.2d 415 (1990); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

16. Presumably, if the State were able to determine the order in which the attacks took place, petitioner would not object to application of the "great risk of death" aggravator to the murder victim whose attacked occurred at the latest time. The fact of ambiguity about the order of the attacks, coupled with the fact that both Charisse and Lacie Jo died, permits petitioner to contend that the aggravator cannot be applied to either.

17. Thus, in *Cone,* the Tennessee Supreme Court stated it was "doubtful that the record in the present case sustains the jury verdict as to this aggravating circumstance." *Id.* Cone murdered two persons in their home. On the day before the murders, he "shot two persons and attempted to shoot a third in escaping from an armed robbery after a high-speed automobile chase." *Id.* The day of the murders, Cone also terrorized another person. *Id.*

18. In a recent decision, the Tennessee Court of Criminal Appeals rejected an argument very similar to that made by the petitioner in this case:

We turn first to the jury's finding that each of these Defendants-with respect to each murder-knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder. . . . The proof at trial established that McKay and Sample were acting jointly to kill three people, and they fired at least seven gunshots between them. Thus, while the Defendants were shooting and murdering Cooke–Jones and Wallace were at a great risk of death; and while they were shooting and murdering Jones–Cooke and Wallace were at a great risk of death.

Defendants contend that this analysis results in "double counting" because it counts each murder victim as being one of the two persons put at great risk during the other victim's murder. . . . We respectfully reject the Defendants' argument, finding that this analysis favors form over substance. If the defendants had succeeded in killing only one of the victims, there would be no question about the applicability of this factor: that is, the Defendants would each be eligible for the death penalty based on this factor alone. Under the Defendants' reasoning, this factor alone does not make them eligible because they succeeded in killing two of the victims. That the Defendants managed to kill two of three peo-

Although there are very few Tennessee decisions that attempt to define the parameters of the "great risk of death" aggravating circumstance, this Court is unable to conclude that application of that factor under the circumstances in question was "so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis,* 497 U.S. at 779. On the day in question, the record evidence demonstrates that Payne went on a murderous rampage with a butcher knife in a confined space in which three people were present, two of them small children. As a result of Payne's actions, two of those people were killed and the third seriously

injured. Payne does not and cannot dispute that his conduct caused a great risk of death to Nicholas Christopher, the surviving victim. Moreover, the totality of Payne's actions while in the Christophers' apartment would seem to fit within the Tennessee Supreme Court's description of "either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based." *Cone,* 665 S.W.2d at 95.[19]

The record contains evidence that would permit a rational jury to find the "great risk of death" aggravating circumstance with respect to both murder victims.[20] Ac-

ple-instead of only one of three-should not make them *less* eligible for the death penalty. The jury properly applied this aggravating factor to both of the Defendants' sentences.

*Sample v. State,* No. W199901202CCAR3PC, 2001 WL 43381, at *10 (Tenn.Crim.App. Jan. 17, 2001) (footnotes omitted), *appeal granted* (Tenn. July 9, 2001) *and appeal denied* (Tenn. Sept. 17, 2001). As in this case, *Sample* involved a situation in which three people, other than the perpetrators, were present and two of the three were murdered. The court went on to dismiss the factor that distinguishes this case from *Sample:*

> Arguably, each Defendant was also put at a great risk of death by the other Defendant's actions of firing his gun in the store. There was no proof at trial, however, that Sample was ever in McKay's line of fire or vice versa, or that either Defendant fired his gun randomly so as to endanger the other Defendant. Rather, the proof established that McKay and Sample took pains to execute Cooke and Jones by shots to the backs of their heads, and they tried to do the same to Wallace.

*Id.* at 2001 WL 43381, *10 n. 13.

Although the recent decision of the Tennessee Court of Appeals in *Sample* was obviously not available when Payne's conviction was on direct review, the Tennessee Supreme Court had affirmed the convictions and death sentences in this case prior to Payne's trial. *State v. McKay,* 680 S.W.2d 447 (Tenn.1984).

**19.** Petitioner argues, citing the "mass murder" aggravating circumstance, that "[i]f the

General Assembly had intended that the number of murder victims in an episode such as the one here be used to establish an aggravating circumstance, it would have set the number of victims at two instead of three." P. Supp. Br. at 59. This argument ignores that fact that Payne's eligibility for the death penalty under the "great risk of death" aggravator is based, in part, on the injuries to Nicholas Christopher.

**20.** Payne's suggestion that the State did not ask the jury to find this aggravating circumstance with respect to Lacie Jo Christopher, P. Supp. Br. at 58–59, is not supported by the record. The record contains no explicit statement that the State did not intend that the "great risk of death" aggravator be considered with respect to the murder of Lacie Jo Christopher. Addendum 1, Vol. 2, at 130–32 (notice of intent to seek the death penalty); *id.,* Vol. 20, at 1647–50 (jury instructions), 1652–53 (verdict forms).

In support of his argument, petitioner cites two statements made by prosecutors. During opening arguments in the penalty phase, the lead prosecutor stated:

> Another aggravating factor that we expect the proof to have shown and to continue to show during this stage of the trial is that the defendant caused the risk of death to two or more persons other than the person murdered. And of course, in this case there were three people there. At the time that he murdered Charisse he not only caused a risk of death or serious bodily harm-or death to others but did cause death

cordingly, the Court GRANTS summary judgment to respondent on Claim 17.

### D. The Jury's Application of the "Heinous, Atrocious, or Cruel" Aggravating Circumstance was Unconstitutional (Claim 16)

In his sixteenth claim for relief, petitioner argues that the jury's application of the "especially heinous, atrocious, or cruel" aggravating circumstance violated the Eighth and Fourteenth Amendments. Petition at ¶¶ 195–200. In particular, petitioner alleges that that circumstance is vague and overly broad, *id.* at ¶ 199, and that it does not perform the constitutionally required function of narrowing the category of persons convicted of first-degree murder down to a smaller, more culpable subset who are eligible for the death penalty, *id.* at ¶ 200.

In this Court's previous order, this Court held that the "heinous, atrocious, or cruel" aggravating factor was, on its face, unconstitutionally vague, 5/31/01 Order at 190–91, and that the limiting instruction provided the jury was insufficient to cure that deficiency, *id.* at 191–92. Although the Tennessee courts have approved a narrowing construction of the statutory language, *id.* at 192–94, the Court was unable to grant summary judgment to respondent for two reasons. First, it was not clear from the opinion of the Tennessee Supreme Court on direct review that it applied the narrowing construction in reviewing Payne's death sentences. Second, it was not clear that the murder of Lacie Jo Christopher falls within the limiting construction established by the Tennessee Supreme Court. *See id.* at 195–96.[21] Accordingly, the Court asked the parties to submit supplemental briefs addressing these issues.

■ Before addressing the legal standards applicable to this issue, it is necessary to make explicit what was at least implicit in this Court's previous order. *See* 5/31/01 Order at 193–94. In particular, the Court holds that the narrowing construction of the "heinous, atrocious, or cruel" aggravating factor adopted by the Tennessee Supreme Court in *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), is constitutionally sufficient. In particular, the limiting construction employed by the Tennessee Supreme Court in *Williams* is similar (although not identical) to that approved by the Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 654–55, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *see also Maynard v. Cartwright*, 486 U.S. 356, 365, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)

to one other and was serious risk of death to one other one as well as the one other one he killed. So that one we expect to be proven, and basically has been proven and there's not much contradiction of that.

*Id.,* Vol. 18, at 1498. The second statement cited by petitioner provides even less support for his position. In closing arguments, a prosecutor stated:

The second fact. That the defendant caused death or great bodily harm, the risk of it, to two or more people. Who were these people? Charisse Christopher was murdered. Lacie was murdered. And Nicholas came this close, but for excellent medical attention and people who thought fast and moved-seconds counted, and that's the reason Nicholas is an assault to murder

victim and not for murder. So those two people are beyond a shadow of a doubt, the Perry Mason statement, far beyond what the State even has to prove to you.

*Id.* at 1594. Although the first statement is clearly ambiguous, the second statement clearly suggests that the State was asking the jury to find the "great risk of death" aggravator with respect to both Charisse and Lacie Jo. Read together, then, the statements cited by petitioner do not give a clear indication that the State intended to limit the "great risk of death" aggravator to Charisse Christopher.

21. The Court did hold that the murder of Charisse Christopher fell within the Tennessee Supreme Court's limiting construction. *Id.* at 196 n. 115.

(heinous, atrocious, or cruel aggravating factor would be constitutional if limited to "torture or serious physical abuse," but not foreclosing the possibility that other limiting constructions would be constitutionally acceptable).

The next issue to be addressed is the standard this Court should apply in determining whether the Tennessee Supreme Court applied its limiting construction in this case. The relevant Supreme Court decisions on this subject have, unfortunately, become increasingly arcane and difficult to apply. In *Lewis v. Jeffers*, 497 U.S. at 764, 110 S.Ct. 3092, another decision construing Arizona's version of the "heinous, atrocious, or cruel" aggravator, the Supreme Court stated that, when a state appellate court has adopted a valid limiting construction [22] and applied it in a particular case,[23] federal court review is limited:

> Apart from its analysis of Arizona's subsection (F)(6) cases to determine whether the aggravating circumstance was facially valid-*i.e.*, whether the Arizona courts had given a sufficiently narrow limiting construction to the circumstance-the Court of Appeals in this case therefore erred in conducting a *de novo*, case-by-case comparison of the facts of those cases with the facts of the instant case.

*Id.* at 779, 110 S.Ct. 3092. Under those circumstances, a challenge to the aggravator "reduces, in essence, to a claim that the state court simply misapplied its own aggravating circumstance to the facts of his case," *id.*, which, as previously noted, *see supra* pp. 748, is evaluated under the standards of *Jackson v. Virginia*, 443 U.S. 307,

99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *see* 497 U.S. at 781–83, 110 S.Ct. 3092.

Two years later, in *Sochor v. Florida*, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), the Supreme Court revisited Florida's sentencing scheme, in which the trial judge decides whether to impose the death penalty.[24] In *Sochor*, the petitioner claimed that the trial judge improperly considered two constitutionally invalid aggravating factors, one of which was Florida's version of the "heinous, atrocious, and cruel" aggravator, and the state supreme court failed to cure the error, by holding it harmless, on direct review. The Supreme Court held that the fact that the trial judge weighed the heinousness factor does not violate the Eighth Amendment. In particular, the Florida Supreme Court had previously applied a limiting construction to that aggravating factor, which had been approved, at least in part, by the Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). *See* 504 U.S. at 537, 112 S.Ct. 2114. The petitioner argued that "the State Supreme Court's post-*Proffitt* cases have not adhered to *Dixon*'s limitation as stated in *Proffitt*, but instead evince inconsistent and overbroad constructions that leave a trial court without sufficient guidance." *Id.* at 536–37, 112 S.Ct. 2114 (citing *State v. Dixon*, 283 So.2d 1 (Fla.1973)). The Supreme Court rejected that argument, essentially for the reason that the trial judge can be presumed to have properly applied state law:

> And we may well agree with [Sochor] that the Supreme Court of Florida has

---

**22.** The Supreme Court had previously held, in *Walton*, that the narrowing construction applied by the Arizona Supreme Court survived constitutional scrutiny. *See id.* at 777–78, 110 S.Ct. 3092.

**23.** In *Lewis*, unlike the present case, there was no doubt that the Arizona Supreme Court

had applied the limiting construction in that particular case. *Id.* at 776–77, 110 S.Ct. 3092.

**24.** The jury provides an advisory verdict by majority vote, but the jury is not required to find specific aggravating circumstances.

not confined its discussions on the matter to the *Dixon* language we approved in *Proffitt*, but has on occasion continued to invoke the entire *Dixon* statement quoted above, perhaps thinking that *Proffitt* approved it all. . . .

But however much that may be troubling in the abstract, it need not trouble us here, for our review of Florida law indicates that the State Supreme Court has consistently held that heinousness is properly found if the defendant strangled a conscious victim. . . . *We must presume the trial judge to have been familiar with this body of case law . . . , which, at a minimum, gave the trial judge "[some] guidance"* . . . . Since the Eighth Amendment requires no more, we infer no error merely from the fact that the trial judge weighed the heinousness factor. While Sochor responds that the State Supreme Court's interpreta-

tion of the heinousness factor has left Florida trial judges without sufficient guidance in other factual situations, we fail to see how that supports the conclusion that the trial judge was without sufficient guidance in the case at hand. *Id.* at 537, 112 S.Ct. 2114 (emphasis added; citations omitted; alteration in original). Significantly, the trial judge apparently did not write a detailed opinion explaining his reasoning but, instead, simply listed the aggravating factors he found to have been proven. *See id.* at 530, 112 S.Ct. 2114.[25]

Applying these standards, this Court has previously observed that the Tennessee Supreme Court is required to review death sentences to determine, *inter alia,* that "[t]he evidence supports the jury's finding of statutory aggravating circumstance or circumstances." Tenn.Code Ann. § 39–13–206(c)(1)(B) (formerly Tenn. Code Ann. § 39–2–205(c)(2)); *see* 5/31/01 Order at 198–99. This Court has also held

---

**25.** At the risk of unduly complicating an already complex discussion, it is worth noting that the Supreme Court overturned the death sentence in *Sochor*. In addition to the heinousness factor, the trial judge had found three other aggravating circumstance, including what the Supreme Court refers to as the "coldness factor," a factor that apparently has no parallel under Tennessee law. The Florida Supreme Court on direct review concluded that the evidence did not support the coldness factor, but it nonetheless upheld the death sentence. *See id.* at 530–31, 112 S.Ct. 2114. The Supreme Court explained that the trial judge committed Eighth Amendment error by weighing the coldness factor, *id.* at 540, 112 S.Ct. 2114, and the Florida Supreme Court did not cure that error on direct review by performing a harmless error analysis, *id.* at 539–40, 112 S.Ct. 2114. In that regard, the Supreme Court carefully parsed the relevant portions of the opinion of the Florida Supreme Court, *id.* at 531, 112 S.Ct. 2114, and concluded that it was not possible to determine whether that court had, in fact, performed a harmless error analysis, which would have been sufficient to uphold the death sentence, or whether they had simply

concluded that the death sentence was "proportionate." *Id.* at 539–40, 112 S.Ct. 2114. The Court concluded:

> Although we do not mean here to require a particular formulaic indication by state courts before their review for harmless error will pass federal scrutiny, a plain statement that the judgment survives on such an inquiry is clearly preferable to allusions by citation. In any event, when the citations stop as far short of clarity as these do, they cannot even arguably substitute for explicit language signifying that the State Supreme Court reviewed for harmless error.

*Id.* at 540, 112 S.Ct. 2114. In that regard, the Supreme Court's ultimate decision in *Sochor* rests on grounds similar to those in *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), where the Supreme Court invalidated a death sentence because it was unable to determine whether the Mississippi Supreme Court had properly applied a limiting construction to the "heinous, atrocious, or cruel" aggravator, or whether it had disregarded the aggravator and applied a harmless error analysis. *See* 5/31/01 Order at 186 n. 104.

that, at the time it reviewed Payne's death sentence, the Tennessee Supreme Court had adopted a constitutionally sufficient narrowing construction of the "heinous, atrocious, or cruel" aggravating factor. *See supra* p. 751. If a state court can be presumed to have properly applied its own

decisions, *see Walton,* 497 U.S. at 653, 110 S.Ct. 3047; *Sochor,* 504 U.S. at 537, 112 S.Ct. 2114, then it necessarily follows that the statutorily mandated appellate review was sufficient to cure the deficiencies in the jury instructions on the "heinous, atrocious, or cruel" aggravator.[26]

**26.** The cases cited by petitioner are not on point. *See* P. Supp. Br. at 18–20. In *Clemons,* as this Court previously explained, *see supra* p. 753 n. 25, it was not possible to tell from the Mississippi Supreme Court's opinion whether it was applying a limiting construction to the aggravating circumstance or whether it was disregarding the circumstance and performing a harmless error analysis. In *Maynard v. Cartwright,* 486 U.S. at 356, 108 S.Ct. 1853, as this Court explained in its previous order, *see* 5/31/01 Order at 184, the Supreme Court held that the Oklahoma Supreme Court's appellate review did not cure any constitutional deficiency because the court had not adopted any particular limiting construction of the aggravating circumstance. 486 U.S. at 364, 108 S.Ct. 1853; *see also id.* at 360, 108 S.Ct. 1853.

The Supreme Court's decision in *Richmond v. Lewis,* 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), is similar, in many ways, to its decisions in *Clemons* and *Sochor. Richmond* involved another construction of Arizona's "heinous, atrocious, or cruel" aggravator. The petitioner in *Richmond* was resentenced in 1980, and the Arizona Supreme Court affirmed the death sentence on direct review in 1983, prior to the Supreme Court's decision in *Walton,* which upheld that Arizona Supreme Court's narrowing construction of the "heinous, atrocious, or cruel" aggravator. The five members of the Arizona Supreme Court produced three opinions. Two members of the court, in what the Supreme Court refers to as the "principal opinion," held that the murder was "heinous" and "depraved" (but not "cruel") and that the factor was not unconstitutionally vague. Two justices, in what the Supreme Court refers to as the "concurrence," held that the "heinous, atrocious, or cruel" factor was inapplicable but that a death sentence was appropriate even in the absence of that factor. One justice dissenting, finding that the facts did not support the "heinous, atrocious, or cruel" aggravator and that a death sentence was inappropriate. *See* 506 U.S. at 44–45, 113 S.Ct. 528.

The Supreme Court declined to reach the issue whether the principal opinion of the Arizona Supreme Court properly applied a narrowing construction of the "heinous, atrocious, or cruel" aggravator, *id.* at 51, 113 S.Ct. 528, because, even if they did,

> their votes did not suffice to validate the death sentence. One more proper vote was needed, but there was none. As we have already explained, the concurring justices who also voted to affirm petitioner's sentence did not perform a curative reweighing, while the dissenter voted to reverse. Therefore petitioner's sentence is invalid, whether or not the principal opinion properly relied upon the "especially heinous, cruel or depraved" factor.

*Id.* at 51–52, 113 S.Ct. 528.

The Supreme Court had previously held that, after the concurrence eliminated the heinousness factor, it did not reweigh the aggravating circumstances against the mitigating circumstances, *id.* at 48–49, 113 S.Ct. 528; *see also id.* at 45, 113 S.Ct. 528. In so holding, the Supreme Court stated:

> Our prior cases do not specify the degree of clarity with which a state appellate court must reweigh in order to cure an otherwise invalid death sentence ... and we need not do so here. At a minimum, we must determine that the state court actually reweighed. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale" ..., nor can a court "cure" the error without deciding, itself, that the valid aggravating factors are weightier than the mitigating factors.

*Id.* at 48, 113 S.Ct. 528 (quoting *Stringer v. Black,* 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992)). In so holding, the Supreme Court declined to presume that the Arizona Supreme Court had reweighed as part of their independent review of death sentences. The Supreme Court stated that, "[a]lthough there is some force to this suggestion, any presumption of reweighing is overcome

This Court has previously held that the murder of Charisse Christopher falls within the narrowing construction of the "heinous, atrocious, or cruel" aggravator approved by the Tennessee Supreme Court in *Williams*. *See* 5/31/01 Order at 196 n. 115. Accordingly, the Court GRANTS respondent's motion for summary judgment with respect to petitioner's claim that application of the "harmless, atrocious, or cruel" aggravating factor is unconstitutional with respect to the murder of Charisse Christopher.

■ The next issue to be considered is whether application of the "heinous, atrocious, or cruel" aggravator was unconstitutional with respect to the murder of Lacie Jo Christopher. It is not entirely clear whether this question should be decided applying the standards of *Lewis v. Jeffers* or of *Sochor v. Florida*. Accordingly, the Court will address both standards.

As previously noted, *see supra* p. 751, the Supreme Court's decision in *Lewis v. Jeffers*, 497 U.S. at 779, 110 S.Ct. 3092, precludes this Court from "conducting a *de novo*, case-by-case comparison of the facts [of state-court decisions applying the aggravator] with the facts of the instant case." Instead, this Court's review is limited to determining whether the Tennessee Supreme Court's finding of the aggravating circumstance is "arbitrary or capricious," which, itself, requires a finding that

"no reasonable sentencer could have so concluded." *Id.* at 763, 110 S.Ct. 3092.[27]

The medical examiner testified that Lacie Jo Christopher, the two-and-one-half-year-old victim, died from "multiple stab wounds to the chest, abdomen, back, and head." Addendum 1, Vol. 11, at 490. In particular, "[t]here were three stab wounds to the chest and abdomen, and ... five stab wounds to the back and one slash-like stab wound to the forehead. There were a total of nine stab wounds." *Id.* In response to the question how many of those wounds would have been fatal, the medical examiner testified:

Again, in a stabbing, it's the combination of stab wounds that cause the bleeding and the death. She had one stab wound that would have been rapidly fatal because it cut the aorta, which is the main artery of the body that comes out of the heart and supplies blood to all of the body. She had an injury to the aorta that was associated with one of the stab wounds to the back. There were another three stab wounds that were very serious and may have caused death by themselves. So she has one definitely fatal stab wound, additionally three very serious ones that could have been fatal, and all of the stab wounds together wound have resulted in sufficient bleeding to cause her death.

by the language of the concurrence itself," *id.* at 49, 113 S.Ct. 528, which appeared to take the view that

petitioner's aggravated background provided a *conclusive* justification for the death penalty. The passage plainly evinces the sort of automatic affirmance rule proscribed in a "weighing" State-"a rule authorizing or requiring affirmance of a death sentence so long as there remains at least one valid aggravating circumstance."

*Id.* (quoting *Clemons*, 494 U.S. at 751, 110 S.Ct. 1441).

This case is distinguishable from *Clemons* and *Richmond* because there is no question

that the Tennessee Supreme Court upheld the jury's finding of the "heinous, atrocious, or cruel" aggravator and, therefore, the court had no reason to perform a harmless error analysis.

27. As previously noted, *see supra* p. 751 n. 23, *Lewis* involved a situation in which the Arizona Supreme Court's opinion had explicitly applied the facts of the case at issue to the narrowing construction that had been previously approved. Because that did not happen in this case, there is some question as to whether the *Lewis* "arbitrary and capricious" standard is applicable.

*Id.* at 490–91. Lacie Jo had no defensive wounds. *Id.* at 491. When asked how long Lacie Jo would have lived after being stabbed, the medical examiner testified:

> Well, after the stab wound to the aorta, just a matter of-she would have lost consciousness very quickly because the blood loss from [the] aorta would have caused a reduction of blood pressure so her consciousness would fade out very quickly, but for complete death to have occurred, it would have taken a few minutes.
>
> Q. By a few minutes, what do you mean?
>
> A. Probably less than ten, but consciousness would have been lost. She would have been unconscious within probably a minute.
>
> Q. So after the person has stabbed her, concluded the last stab, within a minute Lacie Jo would have been unconscious, and you're saying she would have died probably within the next ten minutes?
>
> A. From the stab wounds that injured the aorta, yes.

*Id.* at 491–92. As respondent notes, R. Supp. Br. at 18, the record is devoid of evidence concerning the sequence in which the wounds were inflicted.

Moreover, respondent correctly notes that the evidence in the record is sufficient to demonstrate that Lacie Jo endured mental torture by witnessing the violent assault on her mother. Nancy Wilson, the apartment manager who lived downstairs from the Christophers, testified that, at about 3:10 p.m., she heard "[l]oud noise. It sounded like a herd running, lots of noise. Yelling. It was hard to distinguish what was being said. I heard crying, heard children crying. The noise subsided just a little bit, slightly." Addendum 1, Vol. 11, at 631. Then, "[a]bout 3:20, it was terribly loud, horribly loud." *Id.* At that time, Ms. Wilson went outside and looked up at the Christophers apartment:

> I was going to go up and see if I could tell them to stop or whoever was there she didn't want there to leave or whatever, and decided it was not in my best interest or anybody else's for me to try to do that. It was just too loud. And at that time the door was banging. And I decided to call the police at that time.

*Id.* at 632.[28] After coming back into the apartment to call the police, Ms. Wilson

> I heard Charisse call Lacie's name. And during-the only thing I could distinguish at any other time over the yelling and the crying and the noise-making was Charisse yelling, get out, get out, get. But it wasn't like she was telling the intruder to get out, it was like, children, get out.

*Id.* at 633–34. Respondent also notes, quite reasonably, that a sentencer could readily infer from the evidence that Charisse Christopher was the first to be assaulted. She was the only adult present and, whatever precipitated the attack, she had to have been the initial target. Whether the children were attacked because they were potential witnesses or because, as very young children will, they refused to leave their mother during a frightening event, will never be known. Whatever the case, a reasonable sentencer could readily infer that Lacie Jo witnessed at least some of the attack on her mother.

For both of these reasons, then, applying the standard set forth in *Lewis v.*

---

28. *See also id.* at 633 (when asked what noise she heard at 3:20, Ms. Wilson testified "[d]oor slamming was what it was"); *id.* at 607–10 (testimony of Laura Picard) (she heard moaning and saw a dark hand with a gold watch slam the Christophers' back screen door three or four times); *id.* at 623 (testimony of Officer Thomas Bailey) (received a call about a domestic disturbance at 3:22 p.m.).

*Jeffers,* the Tennessee Supreme Court's conclusion that the murder of Lacie Jo Christopher was heinous, atrocious, or cruel is not arbitrary and capricious.

If the standards of *Sochor v. Florida* are applicable here, this Court holds that prior decisions interpreting the "heinous, atrocious, or cruel" aggravating circumstance were sufficient to give guidance to the Tennessee Supreme Court when it reviewed the death sentence in this case. In particular, the Tennessee Supreme Court had found the evidence sufficient to support the "heinous, atrocious, or cruel" aggravator where a helpless victim sustains multiple injuries. *See, e.g., State v. Black,* 815 S.W.2d 166 (Tenn.1991) (defendant shot six-year-old girl after killing her mother and sister; a majority of the Tennessee Supreme Court held that "the jury could have found this brutal and senseless execution style murder of a helpless child, who could not protect herself, evinces torture and depravity of mind as defined in *Williams* "); *State v. Jones,* 789 S.W.2d 545, 550 (Tenn.1990) (multiple stab wounds to handcuffed victim); *State v. Barber,* 753 S.W.2d 659, 668–69 (Tenn.1988) (multiple blows to the head of elderly woman); *State v. Zagorski,* 701 S.W.2d 808, 810, 814 (Tenn.1985) (victims' throats were slit even though they were already dying of gunshot wounds). The Tennessee Supreme Court also found the evidence sufficient to support the aggravator where the victim was subjected to prolonged mental torture prior to her murder, even though, when the fatal assault did come, death may have been instantaneous. *State v. Cooper,* 718 S.W.2d 256, 259–60 (Tenn.1986).

For all the foregoing reasons, the Court holds that application of the "heinous, atrocious, or cruel" aggravating circumstance,

under the facts of this case, did not violate Payne's Eighth and Fourteenth Amendment rights. The Court GRANTS summary judgment to respondent on Claim 16.[29]

### E. The Prosecution Engaged in Improper Conduct During the Sentencing Stage (Claim 13)

■ The only other issue to be considered is whether Payne's due process rights were violated by the introduction of the crime-scene videotape during the sentencing phase of his trial. The Court had deferred a decision on this claim, both because neither party had submitted a copy of the videotape and because it was not clear whether the "heinous, atrocious, or cruel" aggravating circumstance, which the tape was introduced to support, would be upheld. *See* 5/31/01 Order at 161–62.

■ In the first place, there has been no showing that admission of the videotape violated the federal constitution or, for that matter, Tennessee law. The evidence was relevant to demonstrate that the murders were heinous, atrocious, or cruel. Petitioner does not cite any decision granting relief to a habeas petitioner because of the introduction of explicit evidence. A federal habeas court generally may not announce and grant retroactive application to new rules of constitutional criminal procedure. *E.g., Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

■ Even if that were not the case, the Court is not convinced that the videotape " 'had substantial and injurious effect or influence in determining the jury's ver-

---

**29.** Because the Court has held that the Tennessee Supreme Court applied an appropriate limiting construction of the aggravating circumstance, the Court does not reach the issue

whether, if application of that aggravating circumstance was improper, Payne's death sentence would still stand under a harmless error analysis.

dict.'" *Brecht v. Abramson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Although the Court does not intend to minimize the impact of the videotape, which depicts the two murder victims lying on the kitchen floor, covered with blood and with the murder weapon at Lacie Jo's foot, it is inescapable that the facts of these murders are inflammatory. During the guilt phase of the trial the jury saw a black-and-white photograph of the murder victims. Given the testimony concerning the number and type of wounds inflicted, and the fact that one of the victims was a two-and-one-half-year-old child, the Court cannot conclude that, even if the tape was introduced in error, that that error was sufficiently substantial to have made the difference in the jury's decision with respect to the death penalty.

Accordingly, the Court grants summary judgment to respondent with respect to the remaining issue in Claim 13.

## F. *Appeal Issues*

The Court must also determine whether to issue a certificate of appealability. Twenty-eight U.S.C. § 2253(c) provides:

(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from-

  (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

  (B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

*Lyons v. Ohio Adult Parole Auth.,* 105 F.3d 1063, 1073 (6th Cir.1997), held that district judges may issue certificates of appealability under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, Title I, § 102, 110 Stat. 1220 (Apr. 24, 1996). The Court also held that the AEDPA codifies in amended § 2253 the standard for issuing a certificate of probable cause found in prior § 2253, which was essentially a codification of *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). *See Lyons,* 105 F.3d at 1073.

> [P]robable cause requires something more than the absence of frivolity ... and the standard for issuance of a certificate of probable cause is a higher one than the 'good faith' requirement of § 1915.... [A] certificate of probable cause requires petitioner to make a substantial showing of the denial of [a] federal right. [A] question of some substance, or a substantial showing of the denial of [a] federal right, obviously [does not require] the petitioner [to] show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further.

*Barefoot,* 463 U.S. at 893, 103 S.Ct. 3383 (internal quotations and citations omitted). The Sixth Circuit has recently cautioned district courts in death penalty cases from granting or denying certificate of appealability without the individualized determination with respect to particular issues required by *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). *Murphy v. Ohio,* 263 F.3d 466 (6th Cir. 2001); *Porterfield v. Bell,* 258 F.3d 484 (6th Cir.2001). Moreover, in *Murphy* the

Sixth Circuit suggested that it was improper for the district court to deny a certificate of appealability before the petitioner had even applied for one. *Murphy*, 263 F.3d at 466. Accordingly, the Court ORDERS the petitioner to apply for a certificate of appealability within thirty days of the entry of this order and to support his application with an appropriate brief. Respondent shall, if he so desires, submit a brief in opposition thirty days after the filing of petitioner's brief.

Also in regards to any appeal, the United States Court of Appeals for the Sixth Circuit has held that the Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915(b), does not apply to appeals of orders denying § 2254 petitions. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997); *cf. McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir.1997) (instructing courts regarding proper PLRA procedures in prisoner civil-rights cases). Rather, to seek leave to appeal *in forma pauperis* in a § 2254 case, and thereby avoid the $105 filing fee required by 28 U.S.C. §§ 1913 and 1917,[30] the petitioner must seek permission from the district court under Rule 24(a) of the Federal Rules of Appellate Procedure. *Kincade*, 117 F.3d at 952. If the motion is denied, the petitioner may renew the motion in the appellate court.

Fed. Rule App. P. 24(a) states, in pertinent part that:

A party to an action in a district court who desires to proceed on appeal *in forma pauperis* shall file in the district court a motion for leave to so proceed, together with an affidavit, showing, in the detail prescribed by Form 4 of the Appendix of Forms, the party's inability

to pay fees and costs or to give security therefor, the party's belief that that party is entitled to redress, and a statement of the issues which that party intends to present on appeal.

The Rule further requires the district court to certify in writing whether the appeal is taken in good faith, and to deny the certificate if the appeal would be frivolous. In this case, for the same reasons that the Court deferred a ruling on the issuance of a certificate of appealability, the Court defers consideration of whether to certify that an appeal would be taken in good faith.

---

**30.** The fee for docketing an appeal is $100. *See* Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

Upon the filing of any separate or joint notice of appeal or application for appeal or

upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant or petitioner.