*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0314a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PERVIS T. PAYNE,

                *Petitioner-Appellant,*

    *v.*

RICKY BELL, Warden,

                *Respondent-Appellee.*

No. 02-5551

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 98-02963—Bernice B. Donald, District Judge.

Submitted: March 4, 2005

Decided and Filed: July 22, 2005

Before: ROGERS, SUTTON, and COOK, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** Todd A. Rose, BURCH, PORTER & JOHNSON, Paris, Tennessee, J. Brooke Lathram, BURCH, PORTER & JOHNSON, Memphis, Tennessee, for Appellant. Joseph F. Whalen III, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, Michael E. Moore, TENNESSEE ATTORNEY GENERAL'S OFFICE, Nashville, Tennessee, for Appellee.

---

**AMENDED OPINION**

---

ROGERS, Circuit Judge. This case was the subject of a prior opinion by this panel, *Payne v. Bell*, 399 F.3d 768 (6th Cir. Jan. 13, 2005), in which, inter alia, we reversed the district court's denial of Payne's petition and ordered the district court to issue a conditional writ of a habeas corpus on the ground that the use of the heinous, atrocious, or cruel ("HAC") aggravating circumstance instruction violated Payne's Eighth Amendment rights, and the Tennessee state court's rejection of Payne's challenge was contrary to clearly established United States Supreme Court precedent. On January 24, 2005, the Supreme Court granted the State of Tennessee's petition for certiorari in another HAC case decided by this court, *Cone v. Bell*, 359 F.3d 785 (6th Cir. 2004), and reversed. *Bell v. Cone*, —U.S.—, 125 S.Ct. 847 (2005). The Supreme Court held that our *Cone* holding had failed to show proper deference to a state court decision upholding that petitioner's sentence because we had presumed that the Tennessee court did not follow its own precedent with respect to a constitutional narrowing construction of the HAC aggravator. 125 S.Ct. at 853. The Respondent Warden subsequently filed with this panel a timely petition for rehearing on the basis of the Supreme

1

Court's decision in *Bell v. Cone*. On February 8, 2005, this panel granted the petition for rehearing with respect to Section II.A. of the prior opinion, and ordered supplemental briefing. Upon consideration of the parties' supplemental briefs and the Supreme Court's opinion in *Bell v. Cone*, we withdraw our prior opinion, *Payne v. Bell*, 399 F.3d 768 (6th Cir. Jan. 13, 2005), and replace it with this amended opinion.[1]

Petitioner Pervis T. Payne was sentenced to death in a Tennessee state court for the murder of Charisse Christopher and her daughter Lacie Christopher. Payne appeals the district court's denial of his petition for the writ of habeas corpus. On appeal, Payne alleges three constitutional violations: that during the penalty phase, his Eighth Amendment rights were violated by the instruction on the heinous, atrocious, or cruel aggravating circumstance; that his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated; and that he was denied the effective assistance of counsel. The Tennessee state court decisions upholding Payne's conviction and sentence were not unreasonable applications of clearly established Supreme Court law, and accordingly, the decision of the district court denying the petition for habeas corpus is affirmed.

**I.**

The facts of this case, set forth below, are excerpted from the opinion of the Tennessee Supreme Court, *State v. Payne*, 791 S.W.2d 10 (Tenn. 1990), *aff'd*, 501 U.S. 808 (1991).

> Defendant was found guilty of first degree murder of Charisse Christopher and her daughter, Lacie, and guilty of assault with intent to commit murder in the first degree of her son, Nicholas. He was given the death penalty for each of the murders and thirty (30) years for the assault with intent to commit murder offense.
>
> Charisse Christopher was 28 years old, divorced, and lived in Hiwassee Apartments, in Millington, Tennessee, with her two children, three and one-half year old Nicholas and two and one-half year old Lacie. The building in which she lived contained four units, two downstairs and two upstairs. . . . Defendant's girlfriend, Bobbie Thomas, lived in the other upstairs unit. . . .
>
> Bobbie Thomas had spent the week visiting her mother in Arkansas but was expected to return on Saturday, 27 June 1987, and she and Defendant had planned to spend the weekend together. Prior to 3:00 p.m. on that date, Defendant had visited the Thomas apartment several times and found no one at home. On one visit he left his overnight bag, containing clothing, etc., for his weekend stay, in the hallway, near the entrance to the Thomas apartment. With the bag were three cans of Colt 45 malt liquor.
>
> [At approximately 3:10 p.m., the resident manager, Nancy Wilson, heard a terrible disturbance and called the police.]
>
> Officer C.E. Owen, of the Millington Police Department, was the first officer to arrive at the Hiwassee Apartments. He was alone in a squad car when the disturbance call was assigned to Officers Beck and Brawell. Owen was only two minutes away from the Hiwassee Apartments so he decided to back them up. He parked and walked toward the front entrance. As he did so he saw through a large picture window that a black man was standing on the second floor landing of the stairwell. Owen saw him bend over and pick up an object and come down the stairs and out the front door of the building. He was carrying the overnight bag and a pair of tennis shoes. Owen testified that he was wearing a white shirt and dark colored pants and had "blood all over him. It looked like he was sweating blood." Owen

---

[1] Only Section II.A. has been amended substantively; however, a number of internal references to the conclusion of Section II.A., appearing in other sections, have also been amended. For ease of reading, the opinion, as amended, is set out in its entirety below, without an itemized list of individual amendments.

assumed that a domestic fight had taken place and that the blood was that of the person he was confronting. Owen asked, "[H]ow are you doing?" Defendant responded, "I'm the complainant." Owen then asked, "What's going on up there?" At that point Defendant struck Owen with the overnight bag, dropped his tennis shoes and started running west on Biloxi Street. Owen pursued him but Defendant outdistanced him and disappeared into another apartment complex.

Owen called for help on his walkie-talkie and Officer Boyd responded. By that time Owen had decided Defendant was not hurt and the blood was not his own—he was running too fast. Owen told Boyd that "there's something wrong at that apartment." They returned to 4516 Biloxi. Nancy Wilson had a master key and let them in the locked Christopher apartment. As soon as the door was opened they saw blood on the walls, floor—everywhere. The three bodies were on the floor of the kitchen. Boyd discovered that the boy was still breathing and called for an ambulance and reported their findings to the chief of police and the detective division. A Medic Ambulance arrived, quickly confirmed that Charisse and Lacie were dead, and departed with Nicholas. He was taken to Le Bonheur Children's Hospital in Memphis . . . . In addition to multiple lacerations, several stab wounds had gone completely through his body from front to back. . . . He was in intensive care for a period and had [several] operations before he left the hospital, but he survived.

Charisse sustained forty-two (42) knife wounds and forty-two (42) defensive wounds on her arms and hands. . . . [The medical examiner] said no wound penetrated a very large vessel and the cause of death was bleeding from all of the wounds; there were thirteen (13) wounds "that were very serious and may have by themselves caused death. I can't be sure, but certainly the combination of all the wounds caused death." He testified that death probably occurred within, "maybe 30 minutes, that sort of time period," but that she would have been unconscious within a few minutes after the stabbing had finished.

The medical examiner testified that the cause of death of Lacie Christopher was multiple stab wounds to the chest, abdomen, back and head, a total of nine. One of the wounds cut the aorta and would have been rapidly fatal.

Defendant was located and arrested at a townhouse where a former girlfriend, Sharon Nathaniel, lived with her sisters. Defendant had attempted to hide in the Nathaniel attic. When arrested he was wearing nothing but dark pants, no shirt, no shoes. As he descended the stairs from the attic he said to the officers, "Man, I ain't killed no woman." Officer Beck said that at the time of his arrest he had "a wild look about him. His pupils were contracted. He was foaming at the mouth, saliva. He appeared to be very nervous. He was breathing real rapid." A search of his pockets revealed a "pony pack" with white residue in it. A toxicologist testified that the white residue tested positive for cocaine. They also found on his person a B & D syringe wrapper and an orange cap from a hypodermic syringe. There was blood on his pants and on his body and he had three or four scratches across his chest. He was wearing a gold Helbrose wristwatch that had bloodstains on it. The weekend bag that he struck Officer Owen with was found in a dumpster in the area. It contained the bloody white shirt he was wearing when Owen saw him at the Hiwassee Apartments, a blue shirt and other shirts.

It was stipulated that Charisse and Lacie had Type O blood and that Nicholas and Defendant had Type A. A forensic serologist testified that Type O blood was found on Defendant's white shirt, blue shirt, tennis shoes and on the bag. Type A blood was found on the black pants Defendant was wearing when seen by Owen and when arrested. Defendant's baseball cap had a size adjustment strap in the back with a U-type opening to accommodate adjustments. That baseball cap was on Lacie's forearm—her hand and forearm sticking through the opening between the adjustment

strap and the cap material. Three Colt 45 beer cans were found on a small table in the living room, two unopened, one opened but not empty, bearing Defendant's fingerprints, and a fourth empty beer can was on the landing outside the apartment door. Defendant was shown to have purchased Colt 45 beer earlier in the day. Defendant's fingerprints were also found on the telephone and counter in the kitchen.

Charisse's body was found on the kitchen floor on her back, her legs fully extended. The right side of her upper body was against the wall, and the outside of her right leg was almost against the back door that opened onto the back porch. . . .

The medical examiner testified that Charisse was menstruating and a specimen from her vagina tested positive for acid phosphatase. He said that result was consistent with the presence of semen, but not conclusive, absent sperm, and no sperm was found. A used tampon was found on the floor near her knee. The murder weapon, a bloody butcher knife, was found at the feet of Lacie, whose body was also on the kitchen floor near her mother. A kitchen drawer nearby was partially open.

Defendant testified. His defense was that he did not harm any of the Christophers; that he saw a black man descend the inside stairs, race by him and disappear out the front door of the building, as he returned to pick up his bag and beer before proceeding to his friend Sharon Nathaniel's to await the arrival of Bobby Thomas. He said that as the unidentified intruder bounded down the stairs, attired in a white tropical shirt that was longer than his shorts, he dropped change and miscellaneous papers on the stairs which Defendant picked up and put in his pocket as he continued up the stairs to the second floor landing to retrieve his bag and beer. When he reached the landing he heard a baby crying and a faint call for help and saw the door was ajar. He said curiosity motivated him to enter the Christopher apartment and after saying he was "coming in" and "eased the door on back," he described what he saw and his first actions as follows:

> I saw the worst thing I ever saw in my life and like my breath just had—had tooken—just took out of me. You know, I didn't know what to do. And I put my hand over my mouth and walked up closer to it. And she was looking at me. She had the knife in her throat with her hand on the knife like she had been trying to get it out and her mouth was just moving but words had faded away. And I didn't know what to do. I was about ready to get sick, about ready to vomit. And so I ran closer—I saw a phone on the wall and I lift and got the phone on the wall. I said don't worry. I said don't worry. I'm going to get help. Don't worry. Don't worry. And I got ready to grab it—the phone but I didn't know no number to call. I didn't know nothing. I didn't know nothing about no number or—I just start trying to twist numbers. I didn't know nothing. And she was watching my movement in the kitchen, like she—I had saw her. It had been almost a year off and on in the back yard because her kids had played with Bobbie's kids. And I have seen her before. She looked at me like I know you, you know. And I didn't know what to do. I couldn't leave her. I couldn't leave her because she needed—she needed help. I was raised up to help and I had to help her.

He described how he pulled the knife out of her neck, almost vomited, then kneeled down by the baby girl, had the feeling she was already dead; said the little boy was on his knees crying, he told him not to cry he was going to get help. His explanation of the blood on his shirt, pants, tennis shoes, body, etc., was that when he pulled the knife out of her neck, "she reached up and grab me and hold me, like she was wanting me to help her . . .", that in walking and kneeling on the bloody floor and touching the two babies he got blood all over his clothes. He said he went

to the kitchen sink, probably twice, to get water to drink when he thought he was going to vomit, but he denied that he went into the bathroom at any time or used the bathroom lavatory to wash up, as Nancy Wilson testified she heard someone do after the violence subsided.

He was then suddenly motivated to leave and seek help and he described his exit from the apartment as follows:

> And I left. My motivation was going and banging on some doors, just to knock on some doors and tell someone need help, somebody call somebody, call the ambulance, call somebody. And when I—as soon as I left out the door I saw a police car, and some other feeling just went all over me and just panicked, just like, oh, look at this. I'm coming out of here with blood on me and everything. It going to look like I done this crime.

The shoulder strap on the left shoulder of the blue shirt he was wearing while in the victim's apartment was torn, a fact he did not seem to realize and could not remember when it happened. He said he ran because the officer did not seem to believe him. He claimed that he had the Colt 45 beer with him as he ran; that the open can with beer in it spilled into the sack, as he ran from Owen, the bottom of the sack broke, the beer and tennis shoes were scattered along his route. He said that what witnesses had described as scratches were stretch marks from lifting weights.

Defendant presented five character witnesses who testified that Defendant's reputation for truth and veracity was good. Ruth Wakefield Bell testified that she had known Defendant all of his life. She was age 40 and lived in the same block on Biloxi as the Hiwassee Apartments, across the street. She said that on the Saturday afternoon of the murders, Defendant knocked on her door, identified himself and she looked out her bedroom window and saw him, but she did not let him in—she was upset with her boyfriend and did not want to see or "entertain" anyone. She denied that she was afraid to let him in—or that there was anything unusual about his appearance. She estimated that it was about twenty minutes after he knocked on her door that she saw police cars and an ambulance across the street. Defendant testified that he knocked on her door just before he decided to go to Sharon Nathaniels and went in the Hiwassee Apartments to pick up his bag and beer.

791 S.W.2d at 11-15. The jury convicted Payne of two counts of first degree murder and one count of assault with intent to commit murder.

At the sentencing phase, the State presented two pieces of evidence: the testimony of Charisse's mother, Mary Zvolanek,[2] and a videotape of the crime scene, introduced through the identification of a police detective. 791 S.W.2d. at 17. Payne presented four witnesses at the sentencing phase: his mother and father, his girlfriend Bobbie Thomas, and Dr. John T. Hutson. The Tennessee Supreme Court described their testimony.

> Bobbie Thomas testified that she joined Defendant's father's church and became acquainted with Defendant; that she had a troubled marriage, was abused by her husband and it had a bad effect upon her three children; that Defendant was a very caring person and the time and attention he had devoted to her children had "got them back to their old self." She said she did not drink or use drugs and neither did

---

[2]Mary Zvolanek testified regarding how her grandson Nicholas had been affected by the deaths. Payne's objection to the use of such "victim impact" testimony reached the United States Supreme Court following the Tennessee Supreme Court's affirmation of his conviction and sentence on direct appeal. In upholding Payne's sentence, the United States Supreme Court held that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

Defendant; that it was inconsistent with Defendant's character to have committed these crimes.

Dr. Hutson is a clinical psychologist, who specializes in criminal court evaluation work. He gave Defendant the Wechsler Adult Intelligence Scale (WAIS) revised version. Defendant's scores were Verbal IQ 78, Performance IQ 82, with a variance of plus or minus 3 on the Verbal and plus or minus 4 on the Performance. He testified that the theoretical norm is 100, that actual test results have moved the norm closer to 110; that historically the mental retardation score was 75, but "retardation" is not commonly used anymore. He preferred mentally handicapped. He also gave Defendant the Minnesota Multiphasic Personality Inventory (MMPI). That test consists of 566 questions that tests a number of different things, that give insight into personality functioning, responses to stress and physical performance. Various "scales" measure lying or faking, hypochondria, depression, hysteria, psychopathic deviance, sexuality, paranoia, cyclothymia, schizophrenia and mania. The tests are graded by computer. Dr. Hutson testified that Defendant was in a normal range or near normal range, with the exception of intelligence and schizophrenia. He said that Defendant "was actually lower intellectually than I had anticipated. And he is low enough that I consider it significant." He testified that Defendant scored above the normal—which is moving toward psychotic—but that in his opinion Defendant was not psychotic or schizophrenic—that that scale of the MMPI, "has a racial bias to it. Blacks tend to look higher on it when actually its very normal for them." The testing was performed in October, about three months after the murders. Dr. Hutson described Defendant as "somewhat naive" and one of the most polite individuals he had ever interviewed in jail.

Defendant's parents testified that Defendant had no prior criminal record, had never been arrested and had no history of alcohol or drug abuse; that he worked with his father as a painter, was good to children and a good son.

791 S.W.2d at 17.

Payne's jury was instructed in accordance with former TENN. CODE ANN. § 39-2-203, which provides that the death penalty cannot be imposed unless the jury unanimously finds a statutory aggravating circumstance or circumstances, and which also provides that the jury must weigh these aggravating circumstances against any mitigating circumstances. TENN. CODE ANN. § 39-2-203(e), (i) & (j) (1982); *see also Coe v. Bell*, 161 F.3d 320, 332 (6th Cir. 1998). The jury returned a verdict that Payne should be sentenced to death by electrocution. *See Payne v. Bell*, No. 98-2963-D, slip op. at 2 (W.D. Tenn. May 31, 2001). With respect to Lacie's murder, the jury found that three aggravating circumstances applied: that the murder was committed against a person less than twelve years of age and the defendant was over eighteen; the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder; and that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. *Id.* at 11. With respect to Charisse's murder, the jury found that two aggravating circumstances applied: the defendant knowingly created a great risk of death to two or more persons; and the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. *Id.* at 10-11. The jury did not find either of two additional aggravating circumstances: that the murder was committed while the defendant was engaged in committing, or attempting to commit, rape; or that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant. *Id.* at 11 n.2. Mitigating evidence, as discussed above, was presented; however, as Tennessee juries are not required to list mitigating circumstances, *see* TENN. CODE ANN. § 39-2-203(g), no record exists of the jury's determination on the weight of the mitigating evidence.

Payne was convicted and sentenced on February 16, 1988. Payne filed a notice of appeal with the Tennessee Supreme Court on April 8, 1988, and on April 16, 1990, that court affirmed Payne's conviction and sentences. *State v. Payne*, 791 S.W.2d 10 (Tenn. 1990). The United States Supreme Court granted certiorari on the issue of the use of victim impact testimony at sentencing, and affirmed on June 27, 1991. *Payne v. Tennessee*, 501 U.S. 808 (1991).

Payne filed a petition for post-conviction relief in the Shelby County Criminal Court on January 13, 1992. An interlocutory appeal on the issue of a denied motion for funds to hire investigative assistance followed, with the result that Payne received funds used to locate an out-of-state witness. The evidentiary hearing on the petition for post-conviction relief was held August 29-30, 1996. The court issued an order denying the petition for post-conviction relief on October 10, 1996. On June 26, 1992, Payne also filed a petition for writ of error coram nobis in the same court, alleging discovery of new evidence. This petition was denied in 1997. Payne's appeals from these two denials were consolidated. The Tennessee Court of Criminal Appeals issued a decision affirming the denials on January 15, 1998. *Payne v. State*, No. 02C01-9703-CR-00131, 1998 WL 12670 (Tenn. Crim. App. Jan. 15, 1998). The Tennessee Supreme Court denied further review.

Payne commenced this federal action in the court below in November of 1998, ultimately alleging twenty-four claims. In orders entered in 2001 and 2002, the district court granted summary judgment on twenty-three of the claims; one was withdrawn. On February 3, 2003, the district court granted Payne's motion for the issuance of a certificate of appealability on the issue of the constitutionality of Tennessee's "heinous, atrocious, or cruel" ('HAC") aggravating circumstance, and denied Payne's motion with respect to all other claims. On December 5, 2003, this panel granted Payne's motion to expand the certificate of appealability to include two more issues: (1) whether the prosecution withheld exculpatory information concerning Daryl Shanks, Charisse's boyfriend, from Payne in violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) whether Payne's trial counsel rendered ineffective assistance during the sentencing phase by failing to conduct a sufficient investigation and not calling several witnesses in mitigation. This court denied the motion to expand the certificate of appealability with respect to the remaining claims raised by defendant.

With respect to the first issue before us, the district court denied relief. In the district court's initial order, dated May 31, 2001, the court held both that the statutory language of Tennessee's HAC aggravator was unconstitutionally vague, and that the definitions supplied by the then-applicable Tennessee Supreme Court precedent, *State v. Williams*, 690 S.W.2d 517 (Tenn. 1985), were themselves also unconstitutionally vague. *See Payne v. Bell*, No. 98-2963-D, slip op. at 190-91 (W.D. Tenn. May 31, 2001). The district court, however, then stated that "[e]ven though Petitioner's jury relied on a facially vague statutory term and no proper limiting instruction was given, the Supreme Court's decisions make clear that any constitutional error can be cured on appellate review." *Id.* at 192. Following supplemental briefing, the district court on March 25, 2002, granted the respondent's motion for summary judgment on this claim, holding that the Tennessee Supreme Court cured the deficiencies in the unconstitutional jury instruction by implicitly applying a constitutionally sufficient narrowing construction. *Payne v. Bell*, 194 F. Supp. 2d 739, 752-56 (W.D. Tenn. 2002).

The district court denied relief on the *Brady* claim because the evidence allegedly suppressed by the prosecution was not material to Payne's conviction. The district court denied relief on the ineffective assistance of counsel claim because the state court decision rejecting Payne's claim was not an unreasonable application of clearly established Supreme Court law.

## II.

**A. Use of the "Heinous, Atrocious, or Cruel" Aggravating Circumstance**

This case is not materially distinguishable from *Bell v. Cone*, —U.S.—, 125 S.Ct. 847 (2005), a case in which the Supreme Court reversed a grant of habeas corpus. We must therefore come to the same conclusion in this case.[3] As in *Cone*, the Tennessee Supreme Court's rejection of petitioner's challenge to the "heinous, atrocious, or cruel" ("HAC") aggravator was not contrary to clearly established federal law as determined by the United States Supreme Court. This is the standard required for federal habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under 28 U.S.C. § 2254(d),

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2000). This court has elaborated on the statutory language.

> A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Court] on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Court's decision. A state court decision involves an "unreasonable application" of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts of the case before it in an objectively unreasonable manner.

*Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 409-10 (2000)); *see also Cone*, 125 S.Ct. at 851.

---

[3]The State does not argue that Payne's claim was procedurally defaulted, and in fact concedes that Payne raised the claim in the state courts. Accordingly, there is no need to address procedural default.

Under *Cone*, the use of the HAC aggravator did not violate Payne's Eighth Amendment rights, and the Tennessee state court's rejection of Payne's challenge therefore was not "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." Therefore under 28 U.S.C. § 2254(d) a writ of habeas corpus is not warranted by the use of the HAC aggravator.

At the conclusion of the sentencing phase, Payne's jury was instructed that the death penalty could only be imposed if the jury unanimously found at least one of several possible statutory aggravating circumstances, including the HAC aggravator. The trial judge instructed the jury in accordance with the statutory language of TENN. CODE ANN. § 39-2-203(i)(5) (1982), which states that one aggravating factor is that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." The trial judge also gave the jury definitions of these terms in accordance with a limiting construction set out by the Tennessee Supreme Court in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). The instruction given to Payne's jury contained the following definitions:

> "Heinous" means grossly wicked or reprehensible; abominable; odious; vile.
> "Atrocious" means extremely evil or cruel; monstrous; exceptionally bad; abominable.
> "Cruel" means disposed to inflict pain or suffering; causing suffering; painful.
> "Torture" means the infliction of severe physical pain as a means of punishment or coercion; the experience of this; mental anguish; any method or thing that causes such pain or anguish; to inflict with great physical or mental pain.
> "Depravity" means moral corruption; wicked or perverse act.

*Payne v. Bell*, No. 98-2963-D, slip op. at 181-82 (W.D. Tenn. May 31, 2001).

This instruction is extremely similar to the instruction given in *Bell v. Cone*, —U.S.—, 125 S.Ct. 847 (2005), and therefore, as the Supreme Court did in that case, we assume without deciding that the instruction is unconstitutionally vague. Cone's jury was instructed that the death penalty could be imposed if the jury found that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." *Cone v. Bell*, 359 F.3d 785, 794 (6th Cir. 2004). The court further defined these terms to the jury, stating that:

> "Heinous" means extremely wicked or shockingly evil.
> "Atrocious" means outrageously wicked and vile.
> "Cruel" means designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others, pitiless.

*Id.* A panel of this court held that the instruction, as given to the jury, was unconstitutionally vague. *Id.* at 796-97. The Supreme Court did not reverse this portion of the Sixth Circuit opinion, assuming without deciding that the instruction was vague. *Cone*, 125 S.Ct. at 851 n.5.

We assume that the instruction given to Payne's jury was also unconstitutionally vague.[4] But as the Supreme Court instructed, we must look beyond the instruction given to the jury in order to determine if a defendant's Eighth Amendment right was violated by the use of an HAC aggravator. *See Cone*, 125 S.Ct. at 852. Even where the jury is given an unconstitutionally vague instruction, if on appeal the state court applies "a narrowing construction of the aggravator," and that construction is constitutional, then there is no Eighth Amendment violation.[5] *Id.* And in Payne's case, the Tennessee Supreme Court can be presumed to have applied a constitutional narrowing construction. Therefore, no Eighth Amendment violation occurred.

At issue in *Cone* was the question of when a state appellate court can be said to have applied a narrowing construction. The Tennessee Supreme Court opinion affirming Cone's sentence had made no mention of an existing Tennessee case, *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981), that provided a limiting construction for the HAC aggravator. Instead, in reviewing the sufficiency of the evidence supporting Cone's sentence, the Tennessee Supreme Court discussed the facts of the murders without specific mention of the legal standard.

> The jury . . . found that the murders in question were especially heinous, atrocious, or cruel in that they involved torture or depravity of mind as provided in T.C.A. § 39-2-203(i)(5). The evidence abundantly established that both of the elderly victims had been brutally beaten to death by multiple crushing blows to the skulls. Blood was spattered throughout the house, and both victims apparently had attempted to resist, because numerous defensive wounds were found on their persons. The only excuse offered in the entire record for this unspeakably brutal conduct by the accused was that these elderly victims had at some point ceased to "cooperate" with him in his ransacking of their home and in his effort to flee from arrest. As previously stated, it was stipulated by counsel for appellant that there was no issue of self-defense even remotely suggested. The deaths of the victims were not instantaneous, and obviously one had to be killed before the other. The terror, fright and horror that these elderly helpless citizens must have endured was certainly something that the jury could have taken into account in finding this aggravating circumstance.

---

[4] In its initial briefing, the state had argued that the instruction given to Payne's jury was distinguishable from the instruction given to Cone's jury, and that therefore, the instruction was constitutional. An HAC aggravator is unconstitutional when "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). The changes made by Tennessee to the HAC jury instruction from the time of Cone's sentencing to Payne's sentencing did not in any way increase the extent to which the jury instruction acted as a "restraint on the arbitrary and capricious infliction of the death sentence." For example, Cone's jury was instructed that "cruel" meant "designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others, pitiless," whereas Payne's jury was instructed that "cruel" meant "disposed to inflict pain or suffering; causing suffering; painful." If anything, the changes rendered the instruction more vague. The most substantial revision made by the Tennessee Supreme Court was the addition of definitions for "torture" and "depravity." The definition of "torture" may in fact provide more guidance than did the instruction given to Cone's jury. Payne's jury, however, was instructed that the death penalty could be imposed if it unanimously found that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture *or* depravity of mind." TENN. CODE ANN. § 39-2-203 (emphasis added). The disjunctive "or" permitted the jury to impose the death penalty upon a finding that the murder involved *either* torture *or* depravity of mind. And the definition of "depravity" as "moral corruption; wicked or perverse act," is in fact so similar to the definition of "heinous" that its addition cannot be said to act as a "restraint on the arbitrary and capricious infliction of the death sentence."

[5] Although recognizing that this was the holding of *Cone*, Payne preserves his argument that the Supreme Court in *Cone* was wrong to hold that a sufficiency determination could cure a trial error. According to Payne, only a harmless error analysis can cure a trial court error. Brief of Pervis T. Payne in Response to Warden's Petition for Reconsideration at 2 n.1.

*State v. Cone*, 665 S.W.2d 87, 94-95 (Tenn. 1984); *see also Cone*, 125 S.Ct. at 853-54.  A panel of this court concluded that because the Tennessee Supreme Court had explicitly addressed the sufficiency of the evidence supporting the HAC aggravator without mentioning the limiting construction for the aggravator provided by *Dicks*, it was not possible to presume that the court had in fact applied *Dicks*.  *Cone*, 359 F.3d at 797.  On certiorari, the Supreme Court reversed.

> We do not think that a federal court can presume so lightly that a state court failed to apply its own law.  As we have said before, § 2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.  To the extent that the Court of Appeals rested its decision on the state court's failure to cite *Dicks*, it was mistaken.  Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.
>
> More importantly, however, we find no basis for the Court of Appeals' statement that the state court "simply, but explicitly, satisfied itself that the labels 'heinous, atrocious, or cruel,' without more, applied" to the murder. 359 F.3d, at 797.  The state court's opinion does not disclaim application of that court's established construction of the aggravating circumstance; the only thing that it states "explicitly" is that the evidence in this case supported the jury's finding of the statutory aggravator. *See Cone*, 665 S.W.2d, at 95 (stating that the aggravating circumstance was "indisputably established by the record"). As we explain below, the State Supreme Court had construed the aggravating circumstance narrowly and had followed that precedent numerous times; absent an affirmative indication to the contrary, we must presume that it did the same thing here.  That is especially true in a case such as this one, where the state court has recognized that its narrowing construction is constitutionally compelled and has affirmatively assumed the responsibility to ensure that the aggravating circumstance is applied constitutionally in each case.

*Cone*, 125 S.Ct. at 853 (internal citations and quotations omitted).

The Supreme Court went on to conclude that even without the benefit of the presumption that a state court correctly applies its own law, the Tennessee Supreme Court's decision upholding Cone's sentence must be read to apply the narrowing construction of *Dicks*. *Cone*, 125 S.Ct. at 853. The Tennessee Supreme Court's discussion of the evidence supporting the jury's finding that the HAC aggravator applied "closely tracked its rationale for affirming the death sentences in other cases in which it expressly applied a narrowed construction of the same 'heinous, atrocious, or cruel' aggravator." 125 S.Ct. at 853-54.  The Supreme Court examined several other Tennessee Supreme Court decisions that had expressly applied a narrowing construction, and found that the facts emphasized in those cases were similar to the facts the Tennessee Supreme Court emphasized in Cone's case.

> The facts the court relied on to affirm the jury's verdict—that the elderly victims attempted to resist, that their deaths were not instantaneous, that [Cone's] actions towards them were "unspeakably brutal" and that they endured "terror, fright and horror" before being killed, 665 S.W.2d, at 95—match, almost exactly, the reasons the state court gave when it held the evidence in *State v. Melson*, 638 S.W.2d 342, 367 (1982), to be sufficient to satisfy the torture prong of the narrowed "heinous, atrocious, or cruel" aggravating circumstance.

*Cone*, 125 S.Ct. at 854.

Payne argues that his case is distinguishable from the situation present in *Cone* because in its opinion affirming Payne's sentence, the Tennessee Supreme Court not only did not mention a narrowing construction of the HAC aggravator, it in fact did not mention the HAC aggravator at all. The Supreme Court's opinion in *Cone*, however, provides for this situation: under *Cone*, because there is no "affirmative indication" that the Tennessee Supreme Court did not follow its own precedent that narrowly construed the aggravating circumstance, we must presume that it did. *Cone*, 125 S.Ct. at 853. The fact that, in Cone's case, the Tennessee Supreme Court did examine the facts supporting the aggravator strengthened the United States Supreme Court's conclusion that Tennessee applied a narrowing construction, but was not the basis for the presumption that the Tennessee Supreme Court did so. The presumption that the Tennessee Supreme Court applied a narrowing construction came into being because "the State Supreme Court had construed the aggravating circumstance narrowly and had followed that precedent numerous times" and there was no "affirmative indication to the contrary." *Cone*, 125 S.Ct. at 853. But because the Tennessee Supreme Court did examine the facts supporting the aggravator, "[e]ven absent [the] presumption" that the narrowing construction was applied, the Supreme Court would have held that in Cone's case, the Tennessee Supreme Court in fact applied the narrowing construction. *Id.* Therefore, in Payne's case, it is not determinative that the Tennessee Supreme Court did not explicitly examine the facts supporting the narrowing construction; we need only look to whether there was Tennessee precedent for a narrowing construction and whether there was an "affirmative indication" that the Tennessee Supreme Court did not in fact apply the construction.

The Tennessee Supreme Court in this case can be presumed to have applied a narrowing construction to the HAC aggravator in its decision upholding Payne's sentence. *Cone* itself settles the first half of the inquiry, whether the state has precedent for a narrowing construction. Obviously, as the Supreme Court noted, Tennessee was in the practice of following a narrowing construction for the HAC aggravator. 125 S.Ct. at 854-55. Regarding the second half of the inquiry, whether there is any affirmative indication that the state did not apply a narrowing construction, in Payne's case, no such indication can be found. In fact, there is at least some indication that the state did apply a narrowing construction.

The Tennessee Supreme Court opinion affirming Payne's sentence states that "[p]ursuant to TENN. CODE ANN. § 39-13-205 we have reviewed the sentence of death and are of the opinion that it was neither excessive nor disproportionate to the penalty imposed in similar cases." *State v. Payne*, 791 S.W.2d 10, 21 (Tenn. 1990). Section 39-13-205, a predecessor of which was at the heart of this circuit's now-reversed decision in *Cone*, provides for mandatory appellate review in death penalty cases.

> In reviewing the sentence of death for first degree murder, the Tennessee supreme court shall determine whether:
> (A) The sentence of death was imposed in any arbitrary fashion;
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

TENN. CODE ANN. § 39-13-205 (c)(1) (1989) (current version at TENN. CODE ANN. § 39-13-206 (2003)). Although the Tennessee Supreme Court singled out only the fourth inquiry, whether the sentence was excessive or disproportionate, we cannot lightly disregard that Court's invocation of the entire section. Section 39-13-205 clearly required the Tennessee Supreme Court to consider whether "[t]he evidence supports the jury's finding of statutory aggravating circumstance or circumstances." This is not the situation contemplated by the concurrence in *Cone*, in which "[t]he

state court, in disposing of the case, left one or more of the issues [raised by the prisoner] unaddressed." 125 S.Ct. at 856 (Ginsburg, J., concurring).

As Payne argues, the brief discussion of § 39-13-205 in Payne's case does not compare to the lengthy factual analysis that the Tennessee Supreme Court conducted in *Cone* on the specific issue of whether the jury's finding of the HAC aggravator had evidentiary support. It is also true that a significant portion of the United States Supreme Court opinion in *Cone* focused on the factual analysis. Nonetheless, the discussion of § 39-13-205 clearly takes this case out of the realm of those in which there is an affirmative indication that the state Supreme Court did *not* apply a narrowing construction. Accordingly, as the Supreme Court held in *Cone*, we must presume that the Tennessee Supreme Court applied a narrowing construction of the HAC.

"The only remaining question is whether the narrowing construction that the Tennessee Supreme Court applied was itself unconstitutionally vague." *Cone*, 125 S.Ct. at 854. The narrowing construction analyzed in *Cone* was supplied by *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981), *Cone*, 125 S.Ct. at 854, whereas the limiting construction in Payne's case was at least partially supplied by *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). The Supreme Court explained the construction used in *Dicks*, and why it was constitutional.

> In *State v. Dicks*, 615 S.W.2d 126 (Tenn.1981), the state court adopted the exact construction of the aggravator that we approved in *Proffitt* [*v. Florida*, 428 U.S. 242, 255 (1976)]: that the aggravator was "directed at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim,'" *Dicks*, [615 S.W.2d] at 132. In light of *Proffitt*, we think this interpretation of the aggravator, standing alone, would be sufficient to overcome the claim that the aggravating circumstance applied by the state court was "contrary to" clearly established federal law under 28 U.S.C. § 2254(d)(1).
>
> The State Supreme Court's subsequent application of this aggravating circumstance, as construed in *Dicks*, stands as further proof that it could be applied meaningfully to narrow the class of death-eligible offenders. Later in the year that *Dicks* was decided, the court elaborated on the meaning of the aggravator:
>
>> "Although the Tennessee aggravating circumstances [*sic*] [that the murder was heinous, atrocious, or cruel], does not contain the phrase, 'an aggravated battery to the victim' it is clear that a constitutional construction of this aggravating circumstance requires evidence that the defendant inflicted torture on the victim before death or that [the] defendant committed acts evincing a depraved state of mind; that the depraved state of mind or the torture inflicted must meet the test of heinous, atrocious, or cruel." [*State v. Pritchett*, 621 S.W.2d, 127, 139 (Tenn. 1981)] (citation omitted).
>
> With respect to the meaning of "torture," the court held that the aggravator was not satisfied where the victim dies instantly, *ibid.*, but that it was where "the uncontradicted proof shows that [the victim] had defensive injuries to her arms and hands, proving that there was time for her to realize what was happening, to feel fear, and to try to protect herself," [*State v. Melson*, 638 S.W.2d 342, 367 (Tenn. 1982)]. Accord, [*Maynard v. Cartwright*, 486 U.S. 356, 364-65 (1988)] (approving the limitation of the "heinous, atrocious, or cruel" aggravating circumstance to killings in which the victim suffered "some kind of torture or serious physical abuse" prior to the murder). As to "depravity of mind," the court held the fact that the defendant fired a second shotgun blast into a victim after he was dead to be insufficient as a matter of law, see *Pritchett*, 621 S.W.2d, at 139 (explaining that the depravity in such an action falls short of that exhibited by the defendant in [*Godfrey v. Georgia*, 446 U.S. 420 (1980)]), but concluded that, "a killing wherein the victim is struck up to

thirty times, causing an entire room to be covered with a spray of flying blood, and causing the victim's brains to extrude through the gaping hole in her skull," sufficed, *Melson*, 638 S.W.2d, at 367. In light of these holdings, we are satisfied that the State's aggravating circumstance, as construed by the Tennessee Supreme Court, ensured that there was a "principled basis" for distinguishing between those cases in which the death penalty was assessed and those cases in which it was not. *Arave v. Creech*, 507 U.S. 463, 474 (1993).

*Cone*, 125 S.Ct. at 854-55 (internal citations and footnote omitted).

Payne argues that the narrowing construction set out in Tennessee's post-*State v. Dicks* case of *State v. Williams*, 690 S.W.2d 517 (Tenn. 1985), cannot pass constitutional muster. According to *State v. Williams*:

Our statute provides that it is *the murder* which must be *especially* heinous, atrocious, or cruel. The second clause of this statutory provision, *viz.*, ". . . in that it involved torture or depravity of mind," qualifies, limits and restricts the preceding words "especially heinous, atrocious or cruel." This second clause means that to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved torture of the victim or depravity of mind of the killer.

"Torture" means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

However, we hold that "depravity of mind" may, in some circumstances, be shown although torture, as hereinabove defined, did not occur. If acts occurring after the death of the victim are relied upon to show depravity of mind of the murderer, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim. This is true because it is the murderer's state of mind *at the time of the killing* which must be shown to have been depraved.

Thus, mutilation of the dead body of the victim may be found to constitute depravity of mind, but only if the mutilation occurred so soon after the death of the victim that the inference may be fairly drawn that the murderer possessed that depravity of mind at the time of the actual killing. If the length of time intervening between the time of death of the victim and the time of mutilation of the body is so great that the inference cannot be fairly drawn that the murderer possessed the depravity of mind at the time the fatal blows were inflicted, then it cannot be said that the murder, itself, involved depravity of mind.

690 S.W.2d at 529-30 (internal quotations and citations omitted). Payne argues that the *Williams* narrowing construction is missing vital elements present in the *Dicks* construction.

It is clear, however, that the Tennessee Supreme Court in *Williams* was not breaking from prior Tennessee cases, but rather expounding upon them. With respect to the narrowing construction, the *Williams* Court ultimately held that "[t]he defendant's contention that T.C.A., § 39-2-203(i)(5) [the HAC aggravator], is unconstitutionally vague is without merit, *Godfrey v. Georgia*, *supra*, *State v. Pritchett*, *supra*, so long as the abstract terms employed therein are construed and interpreted as we have done in this opinion and other opinions of this Court." *Williams*, 690 S.W.2d at 533. The language "as we have done in this opinion and other opinions of this Court" *id.*, clearly indicates that *Williams* incorporated past decisions, of which *Dicks* would

be one.  The Tennessee Supreme Court case explicitly relied upon, *Pritchett*, was also discussed favorably by *Cone*.  *See Cone*, 125 S.Ct. at 855.  Therefore, the narrowing construction that we presume was applied by the Tennessee Supreme Court in upholding Payne's sentence is in fact the same narrowing construction that the United States Supreme Court declared constitutional in *Cone*.

This case is therefore materially indistinguishable from *Cone*.  The Tennessee Supreme Court is entitled to a presumption that in affirming Payne's sentence, it applied a narrowing construction of the HAC aggravator.  Furthermore, the content of that narrowing construction, as provided by other Tennessee Supreme Court cases, such as *Dicks*, *Pritchett*, and *Williams*, was constitutional.  *See Cone*, 125 S.Ct. at 855.  Therefore, the Tennessee Supreme Court decision affirming Payne's sentence was not a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," and accordingly, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) must be denied.

## B.    *Brady* **Claim**

The remaining claims before us also do not support a grant of habeas corpus relief.  In his state post-conviction petition, Payne raised a claim that the prosecution withheld exculpatory information from Payne in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), specifically, information that the victim Charisse Christopher had a boyfriend who, at one point, admitted to having intercourse with Charisse the night before the murders.  The Tennessee Court of Criminal Appeals, the last state court to issue a reasoned opinion on the issue, affirmed the denial of Payne's petition for post-conviction relief.  *Payne v. State*, No. 02C01-9703-CR-00131, 1998 WL 12670 (Tenn. Crim. App. Jan. 15, 1998).  Given the state court's factual determination on what evidence was in the possession of the prosecution at the time of trial, a determination that we must defer to, the Court of Criminal Appeals' affirmance was not an unreasonable application of clearly established federal law.

Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In order to establish a *Brady* violation, a defendant must show (1) that the evidence at issue was exculpatory, that is, favorable to the accused, *United States v. Bagley*, 473 U.S. 667, 676 (1985); (2) that the evidence was material, so that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *id.* at 682; and (3) that the evidence that was suppressed was known to the prosecution but unknown to the defense at the time of trial, *United States v. Agurs*, 427 U.S. 97, 103 (1976).

The Court of Criminal Appeals described and analyzed Payne's claim as follows:

> At the post-conviction hearing, various witnesses were called to testify as to their participation in the investigation and trial.  Former Millington Police Detective Sammy B. Wilson, the lead investigator in the Christopher murders, testified that during his investigation of this case he had occasion to communicate and work with the district attorney's office.  Detective Wilson kept all notes and reports concerning this case in a notebook and explained that the district attorney general's office had access to this notebook.  Included in this notebook were Wilson's notes from a July 1, 1987 telephone conversation with Darryl Shanks, Charisse Christopher's boyfriend.  The notes revealed that Shanks saw Charisse on the Thursday evening preceding the murder.  Detective Wilson could not recall whether Shanks had said he had spent the night at Christopher's apartment.

On November 11, 1992, after the post-conviction hearing had been initiated, Darryl Shanks signed an affidavit, submitted by the appellant's post-conviction investigator, which stated, in part:

> The last time I saw Charisse was during the early morning hours of June 27, 1987. I stopped at her apartment and spent the night with her, and we had sex. I left the apartment approximately eight hours before she was killed. I did inform the prosecuting attorney, Henderson, of this fact.

At the hearing, Shanks testified that when he signed the affidavit he had misconstrued the inquiry into the nature of his relationship with Charisse. He stated that he understood his answer to mean that he previously had sexual relations with Charisse during the course of their relationship, but not on the night preceding her murder. He revealed that he had been involved in an "on and off" intimate relationship with Charisse Christopher for the past fourteen years. He stated that he last saw Charisse alive the night before her murder. He added that he spent the night at her apartment, however, he averred that they did not have sexual relations because Charisse was menstruating and because Lacie had a nightmare that evening and had slept with them in their bed. He maintained that the last time he and Charisse had intimate relations was approximately two weeks prior to that night.

Jim Garts, the appellant's trial counsel, testified that this was his first death penalty case as a defense attorney, however, he stated that he had been practicing law for over nineteen years, three of which were spent as an assistant district attorney general. Garts maintained that he made every effort to protect his client's constitutional rights. He testified that, because of the odd nature of this case, motive was an important issue. He conceded that, although the State could not show that a particular person had sexual relations with Ms. Christopher on the day of the murders, the testimony from two expert witnesses concerning acid phosphatase found in a sample taken from Ms. Christopher's vagina was both significant and lengthy. Garts' strategy on cross-examination was to show that this testimony did not prove anything with respect to the appellant. The testimony revealed that, although acid phosphatase is a good indicator of sexual contact, it can be found in a person who has not had sex. Garts further testified that, if he had been provided the information that Darryl Shanks had spent the previous night with Charisse Christopher, his strategy would have changed. Specifically, he stated that he would have put Shanks on the stand to show that this expert testimony was "a smoke screen created by the district attorney's office." In other words, if Shanks had testified that he had sexual intercourse with Charisse the previous night, then it would have eliminated the State's expert testimony on phosphatase acid. Even if Shanks had not testified that he had sex the previous night, Garts would still have put him on the stand to create a doubt in the jury's minds as to who was the source of the acid phosphatase. Garts testified that he filed a *Brady* request and that the information regarding Darryl Shanks should have been provided to him.

The State presented the testimony of Tom Henderson, the lead prosecutor in this case. Henderson did not recall meeting or talking with Darryl Shanks, however, his case notes reflect the name of "Daryl Starks." The notes indicate that "Starks" was Charisse Christopher's boyfriend and that an investigator was looking for him. Henderson testified that, because of Garts' former affiliation with the district attorney's office, he had turned over more information to Garts than what was required. He believed that, if Garts had been given the information that Shanks had intercourse with Charisse Christopher the night before the murders, Garts would have used it to explain the acid phosphatase present in Ms. Christopher's body. Henderson also stated that, if Shanks had told him that he had sex with Ms. Christopher the night before the murder, he would have turned the information over

to Garts. However, Henderson would not have considered it *Brady* material if Shanks had merely told him he had spent the night. Henderson admitted that the prosecution attempted to show the appellant had attempted to rape Ms. Christopher. Notwithstanding the State's effort, however, he felt that the jury rejected this theory because it did not find the felony murder aggravating circumstance. Moreover, he felt the strongest evidence indicating rape was the removed tampon and the position of the victim's shorts.

Obviously, the State was in possession of information that Darryl Shanks was the boyfriend of Ms. Christopher. However, as the trial court found, there is not "any indication that the prosecutors had any information in their possession that would indicate that Mr. Shanks and Ms. Christopher had sex[ual] relations the night prior to the murders." The affidavit signed in 1992 and Shanks testimony at the post-conviction hearing are irrelevant to our determination of a *Brady* violation. Our perspective of the undisclosed information is to be evaluated based upon that information which would have been available at the time of the non-disclosure. Thus, our contemporaneous assessment focuses solely on the police investigative report which reveals that Darryl Shanks, Charisse Christopher's boyfriend, "saw [the] victim [the] Thursday nite [sic] [preceding the murders]," and not, as the appellant argues on appeal, "the night before the murder." Next, defense counsel filed a motion requesting exculpatory evidence. However, the motion did not specifically request the name of the boyfriend of the victim. Thus, the only questions remaining are whether the evidence is exculpatory, and, if the evidence is exculpatory, whether the information is material.

The trial court concluded that information revealing Mr. Shanks as the boyfriend of Ms. Christopher is "not . . . the type of information that the prosecutor would have a constitutional obligation to disclose . . . ." We agree with the trial court that the undisclosed material was not exculpatory. We are unpersuaded that, because Shanks spent Thursday night with the victim, Charisse Christopher, prior to her murder on Saturday afternoon, this fact would have served to weaken the State's theory of a sexual motive. Our review focuses, not on speculation or conjecture, but rather upon those undisputed facts and circumstances surrounding the murders. The proof does show that, after a period of injecting cocaine, drinking beer, and looking at sexually stimulating pictures, the appellant entered Ms. Christopher's apartment. Upon his leaving her apartment, she was found lying on her back, a used tampon at her side, her shorts pushed up, and the presence of acid phosphatase in her vagina. We find from these facts that a rational jury could have clearly inferred that the attack upon Charisse Christopher was sexually motivated. Moreover, we conclude that the fact that Shanks spent the night with Ms. Christopher two days prior to her murder would not have diminished the State's theory that the crimes were sexually motivated. Accordingly, we conclude that the information regarding Darryl Shanks is not favorable, or even relevant, to the guilt or innocence of the appellant. The appellant has not satisfied his burden of showing that the undisclosed information is exculpatory. This claim is without merit.

*Payne*, 1998 WL 12670, at *6-8.

The Tennessee court's factual determination eliminates the element of a *Brady* claim that exculpatory evidence be "known to the prosecution but unknown to the defense" at the time of trial. *Agurs*, 427 U.S. at 103. The Tennessee Court of Criminal Appeals determined that the prosecution was not in possession of any evidence at the time of trial that indicated that Shanks and Christopher had intercourse the night before the murders. The only evidence in the possession of the prosecution at the time of trial, according to that court, was the evidence that "Darryl Shanks, Charisse Christopher's boyfriend, 'saw [the] victim [the] Thursday nite [sic] [preceding the murders].'"

*Payne*, 1998 WL 12670, at *8.          Under 28 U.S.C. § 2254(e)(1), this factual determination "shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Although Payne relies upon numerous pieces of evidence to support his argument that the prosecution knew that Shanks and Charisse Christopher had intercourse one or two nights before the murder, he has not carried his burden of rebutting the correctness of the state court determination by clear and convincing evidence. The key piece of evidence relied upon by Payne, Shank's 1992 affidavit, was not available to the prosecution at the time of trial, and therefore does not constitute clear and convincing evidence that the state court determination was wrong. Payne also devotes considerable effort to challenging the prosecutor's credibility in denying that he ever talked to Shanks. He notes that the prosecutor removed Shank's name from a list of potential witnesses after the autopsy report revealed the presence of acid phosphatase in Christopher's vagina. Payne also asserts that the prosecutor's statement that he did not talk to Shanks or did not remember talking to Shanks is unbelievable in light of the importance that the prosecutor admittedly placed on interviewing the victim's boyfriend. Again, it is not sufficient to show that there was some conflicting evidence; rather, Payne must present clear and convincing evidence in order to rebut the presumption of correctness afforded the state court determination. He has not done so in this case.

Payne argues that even accepting the state court determination regarding what evidence was in the possession of the prosecution, that court's holding that the evidence was not exculpatory constitutes an unreasonable application of clearly established federal law. We cannot say that it is. Payne's first-degree murder indictment charged him with "feloniously[,] willfully, deliberately, maliciously[,] and premeditatedly" murdering Charisse and Lacie. Payne was not charged with "murder . . . committed in the perpetration of, or attempt to perpetrate, . . . rape," another form of first-degree murder available at the time. *See* Tenn. Code Ann. § 39-2-202(a) (1987). And although sexual motive was the theory of the prosecution, the Court of Criminal Appeals determined that the evidence available to the prosecution, by itself, was not exculpatory because it would not have weakened the state's theory of sexual motivation. *Payne*, 1998 WL 12670, at *8. It could be argued that if Payne had been aware of this evidence, he could have argued by inference that Shanks and Christopher must have engaged in sexual relations that night. This inference, however, does not demonstrate that the state court unreasonably applied the rule of *Brady* to Payne's petition. Payne is accordingly not entitled to habeas relief.[6]

## C.          Ineffective Assistance of Counsel

Finally, Payne's claim of ineffective assistance of trial counsel does not warrant habeas relief. Payne argues that during the sentencing phase, his trial counsel rendered constitutionally ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to conduct a sufficient investigation and not calling several witnesses in mitigation. The Tennessee Court of Criminal Appeals also addressed this claim in its affirmance of the denial of Payne's petition for post-conviction relief. *Payne*, 1998 WL 12670, at *14-17. That adjudication was not an unreasonable application of clearly established federal law.

---

[6]The district court below disposed of Payne's *Brady* claim regarding the Shanks Evidence on what the court termed "a far simpler ground." *Payne v. Bell*, No. 98-2963-D, slip op. at 44 (W.D. Tenn. May 31, 2001). The district court held that even assuming the truth of Darryl Shanks's 1992 affidavit, the evidence was not material, and therefore the court need not determine whether the state court determination that the evidence was not exculpatory involved an unreasonable application of clearly established federal law. *See id.* at 44 & n.23. In light of our holding, it is unnecessary to consider this alternative analysis.

The Supreme Court has made clear that post-AEDPA claims of ineffective assistance of counsel brought by habeas petitioners will succeed only in very limited circumstances. In *Bell v. Cone*, 535 U.S. 685 (2002),[7] the Supreme Court explained that the question in such a case is:

> whether [the petitioner] can obtain relief on the ground that the state court's adjudication of his claim involved an "unreasonable application" of *Strickland*. In *Strickland* we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"
>
> For [the petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the Tennessee Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner.

535 U.S. at 698-99 (internal citations omitted).

The evidence that was presented by Payne's counsel at sentencing in mitigation, laid out above, consisted of the testimony of Payne's mother and father, his girlfriend Bobbie Thomas, and Dr. John T. Hutson. *See Payne*, 791 S.W.2d at 17. The evidence not presented and the investigation not done were discussed in the opinion of the Court of Criminal Appeals.

> During the guilt phase of the appellant's trial, trial counsel called William Brooks, Willie Wright, Vera Wherry, Sidney Thomas, and John Scott to testify that the appellant had a good reputation for truth and veracity. The record indicates that the prosecutor attempted to question these witnesses about prior bad acts of the appellant including his drug use and reputation as a peeping Tom. . . .
>
> At the post-conviction hearing, four of the five character witnesses who testified at the guilt phase of the appellant's trial again testified as to the appellant's good reputation and character. Specifically, Sydney Thomas reiterated the appellant's attendance at church, the appellant's musical talents and how the appellant taught younger children to play the drums. William Brooks, the appellant's assistant high school principal, testified regarding the appellant's leadership role in high school, including his participation in the band and the glee club. Willie Wright, the owner of a store in Drummonds, stated that he had extended the appellant credit on a store account and that the appellant drove Wright's son to band practice. John Scott, the principal of Munford High School, explained that the appellant got along well with all students and was never a disciplinary problem.
>
> Additionally, four other witness who did not testify at the appellant's trial testified that they were not interviewed by Garts and would have offered mitigating testimony on the appellant's behalf. The appellant's two sisters described their relationship with their brother. They testified that he was always involved in their

---

[7]The Supreme Court's decision in *Bell v. Cone*, 535 U.S. 685 (2002), reversed a 2001 decision of this court, *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001), and remanded the case for further proceedings. The decision issued by this court following that remand, *Cone v. Bell*, 359 F.3d 785 (6th Cir. 2004), addressing the HAC aggravator, was reversed by *Bell v. Cone*, —U.S.—, 125 S.Ct. 847 (2005). The bulk of this opinion involves the 2005 *Bell v. Cone* opinion.

lives and was very protective. They also mentioned that the appellant was a very popular young man. Stephanie Robinson testified that the appellant transported herself and her family to church services. Martha Fain, a guidance counselor at Munford High School, stated that, although the appellant was not a discipline problem, he sometimes needed extra help in science class.

Additionally, the appellant presented testimony of two expert witnesses. Gloria Shettles, a mitigation specialist with Inquisitor Incorporated, testified that she spent approximately sixty hours on this case investigating potential mitigating proof that was not presented at the appellant's sentencing hearing. She testified that "[t]his is probably the easiest investigation I've ever done," because potential witnesses were easily located. In her opinion, Garts' investigation was minimal and very poor. Dr. George Baroff, a clinical psychologist, examined the appellant and confirmed Dr. Hutson's evaluation of the appellant, *i.e.,* an IQ of 78, which placed the appellant in a category of borderline intelligence. However, Dr. Baroff added that the appellant had the reasoning ability of a ten year old child. . . .

The appellant contends that presentation of this evidence would have shown that, up until the present offenses, he had been a good person. Initially, we note that, regarding counsel's failure to interview *all* potential mitigation witnesses, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *St[r]ickland v. Washington*, 466 U.S. at 691. Clearly, the testimony of the non-testifying mitigating witnesses was merely cumulative of that offered by those character witnesses called at both the guilt and penalty phase. Additionally, the testimony of Dr. Baroff merely confirmed that of Dr. Hutson. Finally, Garts' closing argument detailed the appellant's life noting that the appellant had lived an exemplary life until these crimes had been committed. In almost an effort to explain his limited presentation of mitigation witnesses, Garts stated in closing argument:

. . . You have heard from character witnesses from every walk of life. I just chose five people that have known Pervis all his life. People from every walk of life, in education, his high school principal. Farthest thing from anybody's mind that Pervis could ever do or be accused of anything like this. . . .
. . . We could call every person seated back there and they would say essentially the same things about Pervis and their experiences with Pervis over the year. And you can consider the support that he has as a mitigating circumstance.

Again, we cannot minimize trial counsel's obvious concerns that testimony about the appellant's character would have opened the door to questions about the appellant's alleged bad acts. Absent a showing that counsel's tactical decision was uninformed due to inadequate preparation, this court will not second guess the strategic choices made by trial counsel.

*Payne*, 1998 WL 12670, at *15-17 (internal citations omitted).

Payne has not presented arguments explaining how this decision was an unreasonable application of *Strickland*. He argues that the failure to call the additional witnesses "prevented the jury from learning that Payne's life had significant value—that there was something to put on the side of the scale opposite to the aggravating circumstances." Petitioner's Br. at 71. Under the high standard imposed by AEDPA, however, it is not enough to show that counsel may have been ineffective. *See Bell*, 535 U.S. at 698-99. For instance, in *Bell*, the Court did not find error in a trial counsel's decision not to recall guilt phase medical experts during the sentencing phase, stating that the attorney could reasonably assume that the testimony was still fresh in the minds of the jurors.

535 U.S. at 699.  This is similar to Payne's situation, where witnesses who testified to Payne's reputation for truth and veracity during the guilt phase were not recalled.  Payne's arguments are insufficient to "show that the Tennessee Court of [Criminal] Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Bell*, 535 U.S. at 699.

## III.

For the reasons stated above, the district court's decision is affirmed.